**ARTICHOKE JOE'S, California Grand Casino, Fairfield Youth Foundation, Lucky Chances, Inc., Oaks Club Room, Sacramento Consolidated Charities, Plaintiffs,**

v.

**Gale A. NORTON, James McDivitt, Gray Davis, Bill Lockyer, Harlan W. Goodson, John E. Hensley, Michael C. Palmer, J.K. Sasaki, Arlo Smith, Defendants.**

No. CIV.S–01–248–DFL–GGH.

United States District Court, E.D. California.

Aug. 5, 2002.

Richard W. Nicholls, McDonough Holland and Allen, Sacramento, CA, Robert V. Zener, James Hamilton, Swindler, Berlin, Shereff, Friedman, Washington, DC, for Artichoke Joe's, California Grand Casino, Fairfield Young Foundation, Lucky Chances Inc., Oak Club Room, Sacramento Consolidated Charities.

Robert D. Links, Berger, Nadel and Vanilla, San Francisco, CA, Alan Jay Titus, Robb and Ross, Mill Valley, CA, for Artichoke Joe's.

David Michael Fried, San Francisco, CA, for California Grand Casino, Oak Club Room.

Michael V. Franked, Franked and Restroom, Sacramento, CA, for Lucky Chances, Inc.

Edmund F. Brennan, Asst. U.S. Atty., Sacramento, CA, for Gale A. Norton, Sec. of Interior, James McDivitt, Acting Asst. Sec. of Interior.

Marc A. Le Forestier, Kathleen E. Gnekow, Atty. General's Office, Sacramento, CA, for Gray Davis, Bill Lockyer, Harlan W. Goodson, John E. Hensley, Michael C. Member, J.K. Sasaki, Arlo Smith.

Richard G. McCracken, Davis, Cowell an Bowe, San Francisco, CA, for Agua Caliente Bank of Cahuilla Indians (amicus), Hotel Employees and Restaurant Employees Intern. Union (amicus).

Frank R. Lawrence, Holland and Knight, Los Angeles, CA, for California Nat. Indian Gaming Assoc. (amicus).

Fred James Hiestand, Sacramento, CA, for Bi–partisan Group of Offices and Members of the California Legislature (amicus).

*AMENDED MEMORANDUM of OPINION AND ORDER*

LEVI, District Judge.

Plaintiffs challenge the validity of compacts entered into under the Indian Gam-

ing Regulatory Act ("IGRA"), 25 U.S.C. §§ 2701 et seq., between the State of California and certain Indian tribes. The compacts permit the tribes to offer Las Vegas style high stakes gaming, including slot machines. The compacts were specifically authorized by a California constitutional amendment, Proposition 1A, which gives the Governor the authority "to negotiate and conclude compacts ... for the operation of slot machines and for the conduct of lottery games and banking card games by federally recognized Indian tribes on Indian lands in California." Cal. Const. Art. IV, sec. 19(e). The plaintiffs are California card clubs and charities who are prohibited under state law from offering similar sorts of gambling, and thus have been placed at a competitive disadvantage. Plaintiffs allege that the defendants, various state and federal officers, including the Governor and the Secretary of the Interior, violated IGRA and the Fifth and Fourteenth Amendments to the United States Constitution by creating a tribal monopoly on Las Vegas style gaming. Plaintiffs seek both declaratory and injunctive relief to invalidate the existing compacts and to block the execution of any future compacts. The state and federal defendants contend that the court lacks jurisdiction to hear the plaintiffs' claims and that neither Proposition 1A nor the compacts violate federal law. On cross-motions for summary judgment, the court finds that it has jurisdiction over most of the plaintiffs' claims and further finds that neither the compacts nor Proposition 1A violate federal law.

Because of the opinion's length and the wide range of issues addressed, the court provides the following summary. On the standing issues, the court has jurisdiction to resolve the claims against the federal defendants, the claims against the Governor related to existing compacts, and the claims against the State Attorney General and the Director of the California Division of Gambling Control as to the enforcement of state gaming laws against plaintiffs. The court concludes that as to count II, brought against the state defendants as to existing and future compacts, plaintiffs have demonstrated an injury in fact with respect to the Governor and the existing compacts. However, they fail to demonstrate an immediate and imminent threat of harm from possible future compacts, and thus, are not entitled to seek equitable relief as to any future compacts, including potential compacts involving the Lytton Rancheria under count III. Also as to count II, the plaintiffs have established that the Governor's conduct caused their alleged injuries and that a favorable ruling would redress their alleged harms. Further, they have established causation and redressability as to the Attorney General and the Director, but not the Commission, under count IV which seeks to enjoin enforcement of California Penal Code provisions prohibiting plaintiffs and others from engaging in Las Vegas style gambling. The court further concludes that it has jurisdiction over the Governor, Attorney General, and the Director under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

As to count I, which is brought against the federal defendants, the court concludes that plaintiffs may bring a claim to enforce IGRA and the Johnson Act under § 701(a)(1) of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701 et seq. Further, because matters related to the approval of tribal gaming compacts are not committed by law to agency discretion, plaintiffs' claims are not precluded by § 701(a)(2) of the APA. The court also concludes that the plaintiffs fall within the zone of interests arguably sought to be protected by IGRA and the Johnson Act. Finally, because the legal interests of California's Indian tribes are adequately represented by the Secretary of the Interior,

the tribes are not necessary and indispensable parties under Fed.R.Civ.P. 19.

With respect to the merits of the case, the court holds that the class III gaming compacts are valid under IGRA and the Constitution. Because California law through Proposition 1A permits class III gaming for Indian tribes with compacts, it satisfies IGRA's requirement that the state "permit" class III gaming "for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). The court finds that this statutory language cannot reasonably be understood to condition class III Indian gaming on the state's permission of class III gaming to all persons for any purpose. If this were the proper interpretation, IGRA would be a virtual nullity because no state would ever grant class III gaming privileges to all comers for any purpose. Rather, the language is best understood to open the way to class III Indian gaming if the state grants permission to any one group or person, including Indian tribes. For these reasons, the court concludes that the defendants are in compliance with IGRA and the Johnson Act.

■ The court further finds that the tribal class III gaming monopoly does not discriminate on the basis of race. Under well established Supreme Court precedent, "[f]ederal regulation of Indian tribes ... is governance of once-sovereign political communities; it is not to be viewed as legislation of a 'racial' group consisting of 'Indians' ...." *United States v. Antelope,* 430 U.S. 641, 646, 97 S.Ct. 1395, 51 L.Ed.2d 701 (1977) (quoting *Morton v.*

*Mancari,* 417 U.S. 535, 553 n. 24, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974)). So long as the compacts are rationally related to Congress' trust obligation to the tribes, the compacts will not be set aside on constitutional grounds. Because the compacts, including the monopoly on class III gaming, promote tribal economic development, they are rationally related to Congress' trust obligations and do not violate equal protection.

This case presents significant, complex legal issues against a background of even more important and complex policy questions. Those policy questions must be resolved by the political branches and the electorate. The court decides only that the state and federal defendants did not violate federal law by entering into the compacts at issue.

## I. Facts and Procedural History

### A. *Indian Gaming Regulatory Act*

The Indian Gaming Regulatory Act was enacted by Congress in 1988 shortly after the Supreme Court's decision in *California v. Cabazon Band of Mission Indians,* 480 U.S. 202, 107 S.Ct. 1083, 94 L.Ed.2d 244 (1987). In *Cabazon* the Court invalidated California's regulation of Indian bingo on the ground that such regulation was civil rather than criminal in nature and therefore was not authorized by Public Law 280.[1] As a practical result of *Cabazon,* Indian tribes were free to offer gaming on tribal lands subject only to federal regulation or to state criminal prohibitions. Although Congress had been considering bills to regulate Indian gaming for several years, *Cabazon* left something of a regula-

---

1. Public Law 280 permits certain states, including California, to exercise criminal jurisdiction over Indian lands. Public Law 280 provides in relevant part:

Each of the States ... listed in the following table shall have jurisdiction over offenses committed by or against Indians in the areas of Indian country listed ... to the same extent that such State ... has jurisdiction over offenses committed elsewhere within the State ..., and the criminal laws of such State ... shall have the same force and effect within such Indian country as they have elsewhere within the State.

18 U.S.C. § 1162(a).

tory vacuum that made the issue of Indian gaming regulation more pressing.[2]

IGRA was Congress' compromise solution to the difficult questions involving Indian gaming. The Act was passed in order to provide "a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments" and "to shield [tribal gaming] from organized crime and other corrupting influences to ensure that the Indian tribe is the primary beneficiary of the gaming operation." 25 U.S.C. § 2702(1), (2). IGRA is an example of "cooperative federalism" in that it seeks to balance the competing sovereign interests of the federal government, state governments, and Indian tribes, by giving each a role in the regulatory scheme. *See New York v. United States*, 505 U.S. 144, 167–68, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (collecting examples of cooperative federalism).

IGRA functions by dividing gaming into three categories and intensifying the level of regulatory oversight depending on the category of gaming. "Class I gaming" includes social games with prizes of minimal value, as well as traditional forms of Indian gaming, and is subject to exclusive regulation by Indian tribes. 25 U.S.C. §§ 2703(6), 2710(d). "Class II gaming" includes bingo and card games explicitly authorized by the State, or not explicitly prohibited by the State if such games are actually played in the State, but does not include any banking card games or slot machines.[3] *Id.* § 2703(7)(A). Class II gaming is subject to joint regulation by the federal government and tribal authorities. *Id.* § 2710(d).

Class III gaming is defined as all forms of gaming that "are not class I gaming or class II gaming." *Id.* § 2703(8). Class III gaming includes parimutuel horse race wagering, lotteries, banking card games, slot machines, and all games with non-Indian origins.[4] Class III gaming is only lawful on Indian lands if three conditions are met[5]: (1) approval by the governing body of the Tribe and the Chairman of the National Indian Gaming Commission ("NIGC"); (2) permission by the state, in

2. The first bills to regulate Indian gaming were introduced in the 98th Congress, H.R. 4566 and H.R. 6390. Five bills were subsequently introduced in the 99th Congress, H.R. 1920, H.R. 3752, H.R. 2404, S. 2557, and S. 902. In the 100th Congress, S. 555 was introduced shortly before the Court's decision in *Cabazon*, and was followed by S. 1303 and S. 1841, in the Senate, and in the House, by H.R. 1079, H.R. 964, H.R. 2507, and H.R. 3605.

3. In banked or percentage card games, players bet against the "house" or the casino. In "nonbanked" or "nonpercentage" card games, the "house" has no monetary stake in the game itself, and players bet against one another. (Eadington Decl. at ¶ 131). Banked or percentage card games include the types of gaming generally associated with Atlantic City or Las Vegas.

4. Slot machines were developed in the late 19th century and had their origins in saloons.

(*Id.* at ¶ 54). Blackjack was derived from French and Italian card games. (*Id.* at ¶ 55).

5. The statute provides that class III Indian gaming must be:

 (A) authorized by an ordinance or resolution that—
 (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
 (ii) meets the requirements of subsection (b) of this section, and
 (iii) is approved by the Chairman [of the National Indian Gaming Commission],
 (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
 (C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

 25 U.S.C. § 2710(d)(1).

the sense that the state permits "such gaming," "for any purpose by any person"; and (3) existence of a Tribal–State compact that is approved by the Secretary of the Interior.[6]

The Tribal–State compact is the key to class III gaming under IGRA. Under such a compact, the federal government cedes its primary regulatory oversight role over class III Indian gaming, and permits states and Indian tribes to develop joint regulatory schemes through the compacting process.[7] In this way, the state may gain the civil regulatory authority that it otherwise lacks, and a tribe gains the ability to offer class III gaming.[8] *See Keweenaw Bay Indian Community v. United States*, 136 F.3d 469, 472 (6th Cir.1998). IGRA provides that the Tribal–State compact may include provisions relating to a number of issues that arise once class III gaming begins, including the application of state criminal and civil laws, the allocation of jurisdiction between the state and the tribe necessary for the enforcement of gaming laws, and the assessment by the State of gaming activities in order to defray the costs of regulation.[9]

The compacting process begins when a tribe requests negotiations with the state in which its lands are located. *Id.* § 2710(3)(A). IGRA provides jurisdiction in the federal courts to hear a claim by a tribe that a state has failed to negotiate in "good faith." [10] *Id.* § 2710(d)(7)(A). If a court finds that a state failed to negotiate in good faith, IGRA permits the court to order the state and the tribe to conclude a compact within 60 days. *Id.* § 2710(d)(7)(B)(iii). If the parties are unable to agree to a compact within this period of time, IGRA directs the parties to submit their "last best offer for a compact" to a mediator who will then select the

---

**6.** The Secretary of the Interior has 45 days to approve or disapprove a compact, or the compact is deemed approved "to the extent the compact is consistent with [IGRA]." *Id.* § 2710(8)(D). The Secretary may disapprove a compact if it violates IGRA, any other provision of federal law, or "the trust obligations of the United States to Indians." *Id.* § 2710(8)(B).

**7.** IGRA also added 18 U.S.C. § 1166 which states that "for purposes of Federal law, all State laws pertaining to the licensing, regulation, or prohibition of gambling, including but not limited to criminal sanctions applicable thereto, shall apply in Indian country in the same manner and to the same extent as such laws apply elsewhere in the State." Section 1166(d) gives the United States "exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country, unless an Indian tribe pursuant to a Tribal–State compact approved by the Secretary of the Interior under section 11(d)(8) of the Indian Gaming Regulatory Act ... has consented to the transfer to the State of criminal jurisdiction with respect to gambling on the lands of the Indian tribe." 18 U.S.C. § 1166(d).

**8.** Separately, IGRA includes a waiver of the Johnson Act, 15 U.S.C. § 1175(a), which prohibits the use of gambling devices, including slot machines, within Indian country. IGRA's waiver provision states that the Johnson Act "shall not apply to any gaming conducted under a Tribal–State compact that—

(A) is entered into under paragraph (3) by a State in which gambling devices are legal, and

(B) is in effect."
25 U.S.C. § 2710(d)(6).

**9.** Except for these assessments, states may not otherwise impose "any tax, fee, charge, or other assessment upon an Indian tribe or upon any other person or entity authorized by an Indian tribe to engage in a class III activity." *Id.* § 2710(4).

**10.** Although the Court invalidated this provision of IGRA in *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), on the ground that it violated the Eleventh Amendment and state sovereign immunity, the State of California has consented to such suits by waiving its immunity. Cal. Gov't Code § 98005.

more appropriate plan. *Id.* § 2710(d)(7)(B)(iv). In determining whether a state negotiated in good faith, IGRA permits courts to "take into account the public interest, public safety, criminality, financial integrity, and adverse economic impacts on existing gaming activities." *Id.* § 2710(d)(7)(B)(iii)(II).[11]

Finally, IGRA explicitly prohibits gaming on lands taken into trust for the benefit of a tribe after October 17, 1988. *Id.* § 2719(a). This restriction does not apply, however, if the Secretary, having consulted with tribal and state and local officials, and having secured the agreement of the Governor, determines that gaming on the newly acquired lands would benefit the tribe and would not be detrimental to the surrounding community.[12] *Id.* § 2719(b).

B. *California Gaming*

Following the enactment of IGRA, the State of California and various Indian tribes in California attempted to conclude Tribal–State compacts. However, the State and the tribes disagreed about the forms of gaming that would be permitted and the content of the compacts. *See, e.g., Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 64 F.3d 1250 (9th Cir. 1994); *Hotel Employees and Rest. Employees Int'l Union v. Davis,* 21 Cal.4th 585, 88 Cal.Rptr.2d 56, 981 P.2d 990 (1999). These disagreements were ultimately set-

tled, and on September 10, 1999, Governor Davis approved fifty-seven class III gaming compacts on behalf of the State of California. (Complaint at ¶ 39). The compacts, which are effective until December 31, 2020,[13] are identical in most respects. The compacts point to the preferred position accorded to the tribes, noting that the compacts "create a unique opportunity for [each] Tribe to operate its Gaming Facility in an economic environment free of competition from the Class III gaming ... on non-Indian lands in California." (Tribal–State Compact Between the State of California and the Augustine Band of Mission Indians ("Compact"), at 2, § 11.2.1(a), Exh. 1 to St. Defs.' App. of Authorities).

The compacts permit each signatory tribe to operate "gaming devices" or slot machines, banking or percentage card games, and any devices or games that the California State Lottery is authorized to offer. *Id.* at § 4.1. The tribe may initially operate up to 350 slot machines, but, by participating in a series of draws, a tribe may acquire licenses to operate up to 2,000 slot machines. *Id.* at §§ 4.3.1, 4.3.2.2. The tribe must, however, pay a one-time non-refundable fee of $1,250 for each gaming device it operates that goes into a "Revenue Sharing Trust Fund," which distributes up to $1.1 million per year to tribes without compacts. *Id.* at §§ 4.3.2.1, 4.3.2.2(3).[14]

11. IGRA also permits federal courts to consider "any demand by the State for direct taxation of the Indian tribe or of any Indian lands as evidence that the State has not negotiated in good faith." 25 U.S.C. § 2710(d)(7)(B)(iii)(II).

12. Section 2719(b) also states that the restriction on gaming on lands acquired after October 17, 1988 does not apply when:

> (B) lands are taken into trust as part of—
> (i) a settlement of a land claim,
> (ii) the initial reservation of an Indian tribe acknowledged by the Secretary under the Federal acknowledgment process, or

> (iii) the restoration of lands for an Indian tribe that is restored to Federal recognition. *Id.* § 2719(b)(1).

13. The compacts permit a signatory tribe to terminate a compact "in the event the exclusive right of Indian tribes to operate Gaming Devices in California is abrogated." (Compact at § 12.4).

14. Tribes with compacts must also make yearly payments into the Fund according to a graduated formula that increases the amount that each tribe must contribute annually per device up to $4350. *Id.* at § 4.3.2.2(2). Separately, the compacts create a "Special Distri-

Two agencies, the "Tribal Gaming Agency" and the "State Gaming Agency," are responsible for the bulk of regulatory oversight under the compacts. The Tribal Gaming Agency is defined as the regulatory agency designated to carry out the signatory Tribe's regulatory responsibilities, and it has primary responsibility for the on-site regulation of Indian gaming.[15] *Id.* at §§ 2.20, 7.0. The State Gaming Agency, defined as the "entities authorized to investigate, approve, and regulate gaming licenses" under Cal. Bus. & Profs. Code § 19800 *et seq.*, includes the California Gambling Control Commission and the Division of Gambling Control in the California Department of Justice.[16] *Id.* at § 2.18; Cal. Bus. & Profs. Code §§ 19809, 19810A. Members of the Commission are appointed by the Governor, subject to confirmation by the State Senate, and serve four year terms. Cal. Bus. & Profs. Code § 19812A.

As part of its regulatory function, the Tribal Gaming Agency may promulgate rules and regulations governing the management and operation of tribal gaming facilities, although its regulations must be consistent with the State Gaming Agency's statewide rules. Compact at §§ 8.1, 8.4. In certain circumstances, the State Gaming Agency may also promulgate rules directly applicable to Indian gaming facilities. *Id.* at § 8.4.1.

As part of its regulatory oversight, the Tribal Gaming Agency licenses all Indian gaming facilities and all persons who work in and with them. *Id.* at § 6.4.1. However, subject to a variety of exceptions, a person who has been denied a determination of suitability by the State Gaming Agency may not work in or with a gaming facility. *Id.* at §§ 6.4.4(c), 6.4.5. Further, except for "non-key Gaming Employee[s]," the Tribal Gaming Agency must require license applicants to file an application with the State Gaming Agency for a determination of suitability for licensure under the California Gambling Control Act. *Id.* at § 6.5.6. The Tribal Gaming Agency is also charged with inspecting class III gaming facilities to determine if they are in compliance with IGRA, the governing compact, and the Agency's regulations, although the State Gaming Agency may also conduct inspections of its own. *Id.* at § 7.0.

Finally, the compacts specify three conditions that must be met before they become effective. The compacts must be ratified by the State Legislature and be approved by the United States Secretary of the Interior ("Secretary"). Also, because California prohibits class III gaming under Cal. Cons. Art. IV, sec. 19(e), and Cal.Penal Code §§ 330, 330a, 330b, California voters must approve the California Senate's proposed Constitutional Amendment 11 ("Proposition 1A"), that would permit the Governor to enter into class III

---

bution Fund" comprised of payments made by tribes of between 0% and 13% of the gaming device winnings. *Id.* at § 5.1. Revenue deposited into the Special Distribution Fund is available for appropriation by the Legislature for prescribed purposes including payments to state agencies for expenses related to Indian gaming.

**15.** The compacts state that the

"Tribal Gaming Agency" means the person, agency, board, committee, commission, or council designated under tribal law ... to

fulfill those functions by the National Indian Gaming Commission, as primarily responsible for carrying out the Tribe's regulatory responsibilities under IGRA and the Tribal Gaming Ordinance. No person employed in, or in connection with the management, supervision, or conduct of any gaming activity may be a member or employee of the Tribal Gaming Agency. Compact at § 2.20.

**16.** The California Gambling Control Commission also administers the Revenue Sharing Trust Fund. (Compact at ¶ 4.3.1(a)(ii)).

gaming compacts, thereby exempting Indian tribes from the general prohibition on gaming. *Id.* at § 11.1.

All three conditions have been satisfied. In September 1999, the California Legislature ratified the fifty-seven compacts that were signed by the Governor on September 10, 1999, and enacted provisions to expedite the approval of additional identical compacts.[17] Cal. Gov't Code § 12012.25. On March 7, 2000, California voters approved Proposition 1A which amended the California Constitution as follows:

> Notwithstanding subdivisions (a) and (e), and any other provision of state law, the Governor is authorized to negotiate and conclude compacts, subject to ratification by the Legislature, for the operation of slot machines and for the conduct of lottery games and banking card games by federally recognized Indian tribes on Indian lands in California in accordance with federal law.

Cal. Const. Art. IV, sec. 19(e). On May 5, 2000, the Assistant Secretary of Indian Affairs, approved the compacts on behalf of the Secretary of the Interior, expressly finding that "[t]he Governor can, consistent with the State's amended Constitution, conclude a compact giving an Indian tribe, along with other California Indian tribes, the exclusive right to conduct certain types of Class III gaming." (Letter from Kevin Gover, May 5, 2000, Exh. B to Complaint). The Secretary's approval was published in the Federal Register on May 16, 2000. (Notice of approved Tribal–State Compacts, 65 Fed.Reg. 31,189 (May 16, 2000)).

Since the first 57 compacts became effective, five additional compacts have been entered into by the Governor and approved by the Secretary. (Notice of approved Tribal–State Compact, 65 Fed.Reg. 41721 (July 6, 2000); Notice of approved Tribal–State Compact, 65 Fed.Reg. 62749 (October 19, 2000); Pls.' Resp. to State Defs.' Statement of Undisputed Facts ("SUF") at ¶ 15). Further, at least two additional tribes have requested class III gaming compacts, but their requests have been placed on hold by the State until the conclusion of this lawsuit. (*See* Shelley Anne Chang Letters, May 2, 14, 2001, Exhs. K, L to Pls.' Reply). Thirty-nine of the 62 tribes with compacts currently operate casinos with slot machines, 18 of which are located in Northern California. Some 44 California tribes remain without compacts. (Eadington Decl. at ¶¶ 3, 4).[18]

## C. *The Lytton Band*

On March 22, 1991, the Lytton Rancheria, a tribe previously terminated by the federal government under Pub.L. 85–671,

---

**17.** California Gov't Code § 12012.25 provides:

> (b) Any other tribal-state gaming compact entered into between the State of California and a federally recognized Indian tribe which is executed after September 10, 1999, is hereby ratified if both of the following are true:
>
> (1) The compact is identical in all material respects to any of the compacts expressly ratified pursuant to subdivision (a). A compact shall be deemed to be materially identified to a compact ratified pursuant to subdivision (a) if the Governor certifies it is materially identical at the time he or she submits it to the Legislature.

> (2) The compact is not rejected by each house of the Legislature, two-thirds of the membership thereof concurring, within 30 days of the date of the submission of the compact to the Legislature by the Governor. However, if the 30–day period ends during a joint recess of the Legislature, the period shall be extended until the fifteenth day following the day on which the Legislature reconvenes.

**18.** The state defendants' objections to evidence, including to the Eadington declaration, are denied.

72 Stat. 619, was reinstated according to the terms of a stipulation entered into between the Tribe, the United States, and the County of Sonoma where the Tribe's lands historically were located. (*Indians of the Sugar Bowl Rancheria, et al. v. United States*, No. C–86–3660 (N.D.Cal. Mar. 22, 1991) (Stipulation for Entry of Judgment), Exh. G to State Defs.' Motion to Dismiss; Notice of Reinstatement, 57 Fed.Reg. 5214–01 (Feb. 12, 1992)). The stipulation included provisions which permitted the Secretary of the Interior to take land into trust for the then landless Rancheria in the Alexander Valley in Sonoma County. (*Id.* at ¶ 5).

Following the Lytton Rancheria's reinstatement, the Tribe acquired land in San Pablo in Contra Costa County, less than 20 miles from downtown San Francisco. (Eadington Decl. at ¶ 6). Although the Rancheria has not yet requested negotiations to conclude a gaming compact with respect to this land, (Pls.' Resp. to State Defs.' SUF at ¶ 24), in September, 1999, it entered into a Municipal Services Agreement with the City of San Pablo stating that the Rancheria "intends to enter into a compact with the State of California ("State") which provides for the joint exercise of jurisdiction of the Band and the State to regulate gaming on the Property pursuant to the IGRA." (Municipal Ser-

vices Agreement at 2, Exh. J to Pls.' Exhs. to Motion).

However, because the San Pablo land was not acquired until 1999, it fell under 25 U.S.C. § 2719's restriction on class III gaming on lands acquired after October 17, 1988, and the Lytton Tribe could not offer gaming on the San Pablo tract unless it satisfied one of the exceptions enumerated in § 2719(b). On December 27, 2000, the Omnibus Indian Advancement Act of 2000, Pub.L. 106–568, Stat. 2868, went into effect. (Complaint at ¶ 52). Section 819 of the Act ("San Pablo Legislation"), which was passed without hearings or debate, (Pls.' SUF at ¶ 18; Complaint at ¶ 53), effectively "backdated" acquisition of the Lytton Rancheria's land in San Pablo prior to October 17, 1988.[19] Thus, if the Lytton Rancheria seeks to conclude a class III gaming compact covering its land in San Pablo, the San Pablo Legislation apparently exempts it from the consultation requirements in § 2719.

### D. *Plaintiffs' Allegations*

This complaint was filed on February 7, 2001. The plaintiffs in this case consist of four card clubs and two charities that offer class II gaming in Northern California and that are prohibited by the California Penal Code from offering any form of class III gaming including banking card games and slot machines.[20] Plaintiffs attack the mo-

---

19. Section 819 provides:

Notwithstanding any other provision of law, the Secretary of the Interior shall accept for the benefit of the Lytton Rancheria of California the land described in that ... grant deed dated ... October 16, 2000 .... The Secretary shall declare that such land is held in trust by the United States for the benefit of the Rancheria .... Such land shall be deemed to have been held in trust and part of the reservation of the Rancheria prior to October 17, 1988.
Pub.L. 106–568, Stat. 2868.

20. Plaintiffs are Artichoke Joe's in San Bruno, California; California Grand Casino in Pacheco, California; Lucky Chances in Colma, Cali-

fornia; and Oaks Club Room in Emeryville, California. (Complaint at ¶¶ 15–18). Customers at these establishments "play various card games in which participants wager against each other and pay the operator a fee for the use of the facility." *Id.* Plaintiffs Fairfield Youth Foundation and Sacramento Consolidated Charities are non-profit corporations located in Fairfield and Sacramento, respectively. *Id.* at ¶ 19. Both organizations operate bingo games to raise money for charitable organizations. *Id.* at ¶ 20. Each plaintiff submitted a declaration stating that it would like to offer class III gaming and that it has facilities for doing so. Sammut Decl. at ¶ 11 (Artichoke Joe's); Medina Decl. at ¶ 7 (Lucky Chances); Wilkinson Decl. at ¶¶ 3–4

nopoly on class III gaming accorded by the compacts and allege that various state and federal officers violated IGRA and the Fifth and Fourteenth Amendments by entering into, approving, and administering the compacts. The named federal defendants are Gale Norton, Secretary of the Interior, and James McDivitt, Acting Assistant Secretary of the Interior for Indian Affairs ("federal defendants").[21] The named state defendants are Gray Davis, Governor of the State of California; Harlan W. Goodson, Director of the California Division of Gambling Control; John E. Hensley, Chair of the California Gambling Control Commission; Michael C. Palmer, J.K. Sasaki, and Arlo Smith, members of the California Gambling Control Commission; and Bill Lockyer, Attorney General of the State of California ("state defendants"). *Id.* at ¶¶ 21–26.

Plaintiffs argue that the state's prohibition on class III gaming keeps them from competing for part of a significant market—tribal gaming in California may generate up to $4.7 billion per year by 2004. (Eadington Decl. at ¶ 8). According to plaintiffs, the class II gaming they are permitted to offer cannot compete with the Las Vegas style gaming offered by the tribes. (*Id.* at ¶ 19). Banking and percentage card games offer gamblers the chance to win more money and are more profitable for class III operators because the operator can take a stake in the action. (*Id.* at ¶ 20). And because of their stake in the activity, class III operators do not need to charge players by the hand or the hour the way that class II operators do. Slot machines also contribute to the popularity of class III gaming casinos. In most casinos, slot machines account for "in excess of 70% of total gaming winnings," and depending on location, competition, and how they are regulated, each machine may generate between $88 and $440 per day. (*Id.* at ¶¶ 10, 18). As of January 25, 2001, there were over 25,000 slot machines in use on Indian lands in California. (*Id.* at ¶ 11).

Plaintiffs argue that "[m]any customers who presently patronize California cardrooms and charity bingo games are likely to be attracted by the greater variety of games, and the greater payoffs, offered at casinos conducting class III gaming, particularly those that offer slot machines," an effect documented in other states that have introduced tribal gaming. (Complaint at ¶ 29; Eadington Decl. at ¶¶ 25–29 (noting effect of class III Indian gaming in Arizona, Michigan, and New Orleans)). Plaintiffs are especially concerned that a tribe will be permitted to offer class III gaming in an urban area putting class III gaming casinos in closer proximity to the plaintiffs' establishments. (Complaint at ¶ 8).

Plaintiffs' complaint contains four counts. In count I, plaintiffs allege that the federal defendants' approval of the compacts violated the APA, because the compacts, and hence the approvals, violate IGRA, the Johnson Act, and the Fifth Amendment to the United States Constitution. (Complaint at ¶ 75). Plaintiffs essentially make two arguments; they argue that extending a class III gaming monopoly to Indian tribes (1) violates IGRA's "any person, organization, or entity" requirement, 25 U.S.C. § 2710(d), and (2) consti-

---

(California Grand); Taylor Decl. at ¶ 4 (Fairfield Youth Foundation); Beers Decl. at ¶ 3 (Sacramento Consolidated Charities); and Tibbit Aff. at ¶¶ 4–5 (Oaks Club Room).

**21.** Gale Norton became Secretary of the Interior on January 31, 2001. The compacts at issue were approved by her predecessor, Bruce Babbitt. Because Secretary Norton does not suggest that there has been any change in agency policy and for ease of expression, all actions by Secretary Babbitt are treated as actions by Secretary Norton throughout this opinion.

tutes illegal discrimination on the basis of race and violates the Equal Protection and Due Process Clauses of the Fifth and Fourteenth Amendments.

The remaining three counts are all directed against the state defendants and are brought under 42 U.S.C. § 1983. Count II, brought against the Governor, the Director of the California Division of Gambling Control ("Director"), and the Chair and members of the California Gambling Control Commission ("Commission"), alleges that Proposition 1A and the compacts violate IGRA, the Johnson Act, and the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at ¶ 78). In count III, which is directed at the Governor alone, plaintiffs allege that the San Pablo legislation violates IGRA and the Johnson Act, and is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. (*Id.* at ¶ 82–83).

Count IV, brought against the Attorney General, the Director, and the Commission, seeks to preclude enforcement of Cal.Penal Code §§ 330, 330a, 330b which prohibit class III gaming in California. Plaintiffs allege that continued enforcement of these laws, when tribal gaming is exempted, constitutes illegal discrimination on the basis of race or ethnic origin.

Plaintiffs seek declaratory and injunctive relief on all counts. Specifically, plaintiffs seek a judgment to set aside the federal defendants' approval of the compacts and a declaration that such approvals violate IGRA, the Johnson Act, the APA, the Fifth Amendment, and aid and abet the state defendants' violation of the Four-

teenth Amendment. (*Id.* at 31). The plaintiffs also seek (1) with respect to the Governor, Director, and Commission, a declaration that Proposition 1A and the compacts violate IGRA, the Johnson Act, the Supremacy Clause, and the Fourteenth Amendment, an injunction to prevent their continued participation in the administration of the compacts, and an injunction to prevent the Governor from executing any additional compacts; (2) with respect to the Governor, a declaration that any compact with the Lytton Rancheria based on H.R. 5528 violates IGRA, the Johnson Act, the Supremacy Clause, and the Fourteenth Amendment, and an injunction to prevent the Governor from entering into such a compact; and (3) with respect to the Governor, the Attorney General, the Director, and the Commission, a declaration that Article IV, Sec. 19(e) of the California Constitution and Cal.Penal Code §§ 330, 330a, 330b violate the Equal Protection Clause, and an injunction to prohibit enforcement of the Penal Code's general prohibition on class III gaming.

Plaintiffs and defendants have filed cross-motions for summary judgment on all claims, and the state defendants have filed a motion to dismiss. In addition to arguing that Proposition 1A and the compacts are consistent with IGRA, the Johnson Act, and the Fifth and Fourteenth Amendments, the state and federal defendants raise a number of jurisdictional objections. The court has also received several amicus curiae briefs.[22]

Before turning to the merits, it is necessary to address the multitude of objections

---

**22.** Amicus curiae briefs have been filed on behalf of plaintiffs by (1) Blue Devils, Inc., Pinole Area Senior Foundation, Inc., First Baptist Church of El Sobrante, and Lidia Robinson; (2) California Cities for Self Reliance Joint Powers Authority; (3) National Coalition Against Gambling Expansion, Stand–Up for California, Committee on Moral Con-

cerns; and (4) Wildcat Canyon Conservancy. Briefs on behalf of defendants have been filed by (1) Agua Caliente Band of Cahuilla Indians (2) BiPartisan Group of Officers and Members of the California Legislature; (3) California Nations Indian Gaming Association; and (4) Hotel Employees and Restaurant Employees International Union.

to jurisdiction raised by the state and federal defendants and several amici curiae. Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (federal courts must resolve jurisdictional issues before merits). The state defendants argue that: (1) the plaintiffs lack standing; (2) the state defendants are not proper defendants under 42 U.S.C. § 1983 or under Ex parte Young, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); and (3) the case cannot proceed if the state defendants are dismissed because they are necessary and indispensable parties. The federal defendants challenge the court's jurisdiction under the APA. They contend that plaintiffs have no cause of action under the APA and that the plaintiffs are not within the zone of interests protected by IGRA. Finally, the court considers the arguments of amicus curiae, California Nations Indian Gaming Association ("CNIGA"), that the case must be dismissed because the absent Indian tribes are necessary and indispensable parties. Although all of these jurisdictional objections raise issues that potentially preclude the court from reaching the merits of the plaintiffs' claims, and have significantly increased the length and complexity of this opinion, all but a very few fail, and those that succeed do not greatly affect the scope of the inquiry on the merits.

## II. Standing

The requirements for demonstrating standing to sue are well-established. As an "irreducible minimum," Valley Forge Christian College v. Americans United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982), parties who seek to establish standing must show (1) a concrete and imminent "injury in fact", (2) a causal connection between the defendants and the alleged injury, and (3) a likelihood that the injury will be redressed by a favorable decision. Lujan v. Defenders of Wildlife,

504 U.S. 555, 560–61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); Bernhardt v. County of Los Angeles, 279 F.3d 862, 868 (9th Cir.2002). Invoking these concepts, the state defendants advance two arguments on standing. First, they argue that there is no injury in fact with respect to the Governor's future decisionmaking concerning additional compacts; and second they argue that there is no causation or redressability with respect to any of the state defendants.

### A. Injury in Fact and Equitable Relief as to Governor Davis on Counts II and III

Plaintiffs who seek prospective injunctive relief must demonstrate both a sufficient likelihood of future injury, Hawkins v. Comparet–Cassani, 251 F.3d 1230, 1236 (9th Cir.2001), and that there is "a 'likelihood of substantial and immediate irreparable injury.'" City of Los Angeles v. Lyons, 461 U.S. 95, 111, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (quoting O'Shea v. Littleton, 414 U.S. 488, 502, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)); see also Cole v. Oroville Union High Sch. Dist., 228 F.3d 1092, 1100 (9th Cir.2000). The former stems from the Article III case or controversy requirement; the latter is a function of the traditional limits on the power of federal courts to grant equitable relief. Hodgers–Durgin v. De La Vina, 199 F.3d 1037, 1042, 1044 (9th Cir.1999) (en banc). To determine the likelihood of future harm courts are guided "not only by the defendants' past conduct but also by the defendants' avowed future intent." LaDuke v. Nelson, 762 F.2d 1318, 1330 (9th Cir.1985). Further, when a plaintiff seeks to enjoin a state agency and its officers, the plaintiff must "'contend with the well-established rule that the Government has traditionally been granted the widest latitude in the dispatch of its own internal affairs.'" Midgett v. Tri–County Metro. Transp.

*Dist. of Oregon,* 254 F.3d 846, 850 (9th Cir.2001) (quoting *Rizzo v. Goode,* 423 U.S. 362, 378–79, 96 S.Ct. 598, 46 L.Ed.2d 561 (1976)); *see also Hodgers–Durgin,* 199 F.3d at 1042 ("The Supreme Court has repeatedly cautioned that, absent a threat of immediate and irreparable harm, the federal courts should not enjoin a state to conduct its business in a particular way.").

### 1. *Count II: Existing and Future Compacts*

■ As to the Governor and future compacts, it is unnecessary to determine whether the plaintiffs satisfy the Article III injury in fact requirement, because even if they did, plaintiffs would still not be entitled to injunctive relief to prevent the approval of additional compacts by the Governor because they have not demonstrated "a threat of immediate and irreparable harm." *Hodgers–Durgin,* 199 F.3d at 1042.[23]

The plaintiffs argue that there is an immediate threat of future injury because the Governor has already approved sixty-two compacts, the legislature has enacted an expedited approval provision, Cal. Gov't Code § 12012.25(b), and the Governor would be subject to suit if he failed to negotiate in good faith with a tribe that requests a class III gaming compact. 25 U.S.C. § 2710(d)(7). However, while the plaintiffs contend that as many as twenty tribes have expressed an interest in entering into gaming compacts, only two tribes have actually sought to enter into negotiations with the Governor following the approval of the first sixty-two compacts. (Eadington Decl. at ¶5). Negotiation of these compacts has not begun and the terms of these hypothetical compacts are, as yet, unknown. Moreover, it is also unclear if the Governor will approve additional compacts, especially compacts for casinos located in urban areas which allegedly pose the greatest risk to the plaintiffs. In fact, the Governor has declined to enter into further negotiations at least until this lawsuit is resolved. In response to inquiries by the two tribes about entering into class III gaming compacts, the Governor replied negatively stating that "commencing formal negotiations at this time, amidst the uncertainty attending the current status of th[is] litigation, would not ... be prudent."[24] (Chang Letter, May 2, 2001, Exh. K to Pls.' Reply). The substantive legal issues presented in this lawsuit, and the greater policy and empirical issues that lie behind this litigation, are of such magnitude and complexity that it cannot be assumed that a responsible state officer would automatically continue to enter into further, identical compacts no matter the accumulation of experience, the pressures against permitting urban tribal gaming establishments, public opinion, and other potentially relevant economic and legal developments. The many unknowns about additional class III gaming compacts preclude a finding that there is a danger of an

---

**23.** Addressing the propriety of equitable relief while assuming that there is Article III standing does not run afoul of the rule against exercising hypothetical jurisdiction announced in *Steel Co.,* 523 U.S. 83, 118 S.Ct. 1003, because "there is no unyielding jurisdictional hierarchy." *Ruhrgas AG v. Marathon Oil Co.,* 526 U.S. 574, 578, 119 S.Ct. 1563, 143 L.Ed.2d 760 (1999). The court is, therefore, not required to address jurisdictional issues according to a specific checklist and may address jurisdictional issues in any order. *See Midgett,* 254 F.3d at 850; *Hodg-* *ers–Durgin,* 199 F.3d at 1042 n. 3. However, because of the similarities between the Article III inquiry and the standard for granting prospective injunctive relief, the plaintiffs are almost certainly unable to establish Article III standing to seek an injunction to prevent the Governor from entering into additional compacts.

**24.** One of the letters was sent to nine tribes. (Chang Letter, May 2, 2001, Exh. K to Pls.' Reply). It is unclear, however, if all of the tribes requested negotiations.

immediate and irreparable harm from future compacts when no such compacts are even in the negotiation stage.

When a plaintiff both satisfies Article III and demonstrates an immediate and irreparable injury, courts will appropriately grant prospective injunctive relief against state officials. *Lyons*, 461 U.S. at 111–12, 103 S.Ct. 1660. But where, as here, there is an inadequate showing of immediate future irreparable injury, the need to "maintain[ ] the delicate balance between 'federal equitable power and State administration of its own law,'" *Hodgers–Durgin*, 199 F.3d at 1042, compels deference to state officials who are in the consideration phase of their decisionmaking and have not committed to a future course of action. *Lyons*, 461 U.S. at 111–12, 103 S.Ct. 1660. Such restraint is especially important when the requested injunction is a broad one that would apply to "whole categories of potential future acts," in this case, any class III gaming compact. *Hillblom v. United States*, 896 F.2d 426, 431 (9th Cir.1990) (upholding district court's refusal to "declare the inapplicability to the Northern Mariana Islands of any law 'which substantially affects the lives of the inhabitants'"). Moreover, it is also relevant that the plaintiffs may seek declaratory relief as to the existing compacts, a less intrusive remedy than an injunction, and one that can resolve the most pressing issues related to Indian gaming under IGRA in a setting best suited to resolution in the federal courts because the terms of the compacts are not hypothetical. *See Steffel v. Thompson*, 415 U.S. 452, 465–68, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) (describing declaratory relief as less intrusive remedy as compared to injunction); *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir.1985)

("There is no question but that the passive remedy of a declaratory judgment is far less intrusive into state functions than injunctive relief that affirmatively commands specific future behavior under the threat of the court's contempt powers."). Having failed to demonstrate an immediate and irreparable harm, plaintiffs may not seek in count II prospective injunctive relief against the Governor to prohibit him from entering into additional compacts.

In addition, the plaintiffs' "failure to establish a likelihood of future injury similarly renders their claim for declaratory relief unripe" as to future, hypothetical compacts. *Hodgers–Durgin*, 199 F.3d at 1044. As the Ninth Circuit recently explained, "[i]n suits seeking both declaratory and injunctive relief against a defendant's continuing practices, the ripeness requirement serves the same function in limiting declaratory relief as the imminent-harm requirement serves in limiting injunctive relief." (*Id.*) Thus, for the same reason that there is no imminent future injury that justifies prospective injunctive relief, the plaintiffs' claim for declaratory relief with respect to future compacts fails because it is unripe. *Texas v. United States*, 523 U.S. 296, 300, 118 S.Ct. 1257, 140 L.Ed.2d 406 (1998)("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'").

With respect to the existing compacts and the Governor, the plaintiffs have properly alleged an injury in fact which could merit declaratory relief under the Declaratory Judgment Act, 22 U.S.C. §§ 2201 *et seq.* Plaintiffs allege both a violation of their right to equal protection of the laws and economic injury. Together these allegations form an adequate basis for standing to seek declaratory relief.[25]

---

**25.** Because the plaintiffs have viable claims under federal law, *Skelly Oil v. Phillips Petroleum*, 339 U.S. 667, 70 S.Ct. 876, 94 L.Ed. 1194 (1950), does not preclude plaintiffs from seeking a declaratory judgment. (St. Defs.' Motion at 64).

In sum, as to count II, which in part seeks prospective injunctive and declaratory relief against the Governor, the court finds that plaintiffs have failed to demonstrate that they face an immediate and imminent threat of harm from future compacts. For this reason, plaintiffs are only entitled to seek declaratory relief as to existing compacts under count II.

### 2. Count III: Lytton Rancheria

A similar analysis applies to count III of the complaint which seeks declaratory and injunctive relief against the Governor with respect to the Lytton Rancheria. Because the Lytton Rancheria is no closer to entering into a gaming compact than any other tribe without a compact, plaintiffs' injuries with respect to count III are no more imminent than they are with respect to count II. Although the Municipal Services Agreement between the Lytton Rancheria and San Pablo states that the Lytton Rancheria will seek to enter into negotiations for a class III gaming compact, it has not yet done so. (St. Defs.' SUF at ¶ 24). Moreover, because it would permit gaming in an urban area, an eventuality that the plaintiffs contend would be novel and particularly damaging to existing gaming operations, the Governor might be even more reluctant to negotiate a compact with the Lytton Rancheria. For these reasons, equitable relief is improper because there is no threat of immediate and irreparable harm that would warrant an injunction, and the plaintiffs' request for declaratory relief is, therefore, unripe.

█ Further, plaintiffs may not establish jurisdiction on the basis that they have been deprived of a procedural right to petition the Governor and the Secretary concerning the potential adverse affects of a proposed casino. (Pls.' Reply at 39–41). Assuming that § 2719 may afford plaintiffs a procedural right of consultation that was foreclosed by the San Pablo legislation,[26] any such procedural right is not implicated until a tribe requests negotiations for a class III gaming compact on land that was acquired after October 17, 1988. Therefore, Congress' decision to "backdate" the acquisition of the San Pablo land is of no consequence unless and until the Lytton Rancheria seeks to enter into a class III gaming compact. Because any attempt to exercise rights based on § 2719 at this point in time would be premature, plaintiffs' argument that the San Pablo legislation deprived them of procedural rights under § 2719 is also not suited for review.

### B. Causation

To demonstrate causation, the plaintiffs' alleged injuries—competitive economic harm and violation of equal protection—must be "fairly traceable" to the defendant's conduct, *Pritikin v. Dep't of Energy,* 254 F.3d 791, 796 (9th Cir.2001), and the injuries must not be " 'the result of the independent action of some third party not before the court.' " *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)(quoting *Simon v. Eastern Ky. Welfare Rights Org.,* 426 U.S. 26, 41–42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976)). Further,

> [w]hen ... a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else,* much more is needed [than when the plaintiff is the

**26.** The Ninth Circuit applies a different rule to procedural standing claims and requires plaintiffs to show: "(1) that it has been accorded a procedural right to protect its interests, and (2) that it has a threatened concrete interest that is the ultimate basis of its standing." *Churchill County v. Babbitt,* 150 F.3d 1072, 1078 (9th Cir.1998). The court does not reach the question of the full extent of the plaintiffs' procedural rights, if any, under 25 U.S.C. § 2719.

subject of the government's regulation]. In that circumstance, causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well.

*Lujan,* 504 U.S. at 562, 112 S.Ct. 2130 (emphasis in original); *see also G & G Fire Sprinklers, Inc. v. Bradshaw,* 156 F.3d 893, 899–900 (9th Cir.1998) (same). Thus, in order to demonstrate causation, plaintiffs must show that the alleged harms flow directly from the state defendants' actions.

### 1. *Count II: Governor, Commission, and Director*

■ With respect to count II of the complaint, plaintiffs' claim against the Governor satisfies the causation requirement because the Governor approved the compacts that gave rise to the plaintiffs' injuries. (Complaint at ¶¶ 23, 79). It is not material to the causation analysis that Governor Davis does not have ongoing responsibilities under the compacts, once approved. It is enough that his past approval of the compacts caused the plaintiffs' alleged injuries.

Plaintiffs have failed, however, to adequately respond to the state defendants' argument that neither the Director nor the Commission have duties that caused class III tribal gaming. (St. Defs.' Motion for Summary Judgment at 12). Without addressing the issue of causation, plaintiffs' argue only that there is redressability because an injunction preventing the Director and the Commission from renewing their determinations of suitability for persons working in or with the casinos would hamper the casinos' ability to operate. Because causation and redressability are frequently duplicative of one another, plaintiffs presumably hope that in establishing redressability, they will also establish causation.

Causation and redressability, however, are not always two sides of the same coin. "Despite . . . similarities, . . . each inquiry has its own emphasis. Causation remains inherently historical; redressability quintessentially predictive." *Freedom Republicans, Inc. v. Federal Election Comm'n,* 13 F.3d 412, 418 (D.C.Cir.1994); *see also Allen v. Wright,* 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 82 L.Ed.2d 556 (1984) (noting differences between causation and redressability). Here, even if the plaintiffs established redressability, their predictions about the impact of an injunction on the Director and the Commission would not establish an historical connection between the actions of the Director and the Commission, and the plaintiffs' injuries.

As to redressability, plaintiffs rely principally on §§ 6.4.4(b), 6.4.5, 6.4.6, of the compacts which, subject to certain exceptions, prohibit persons from working in or with casinos, or from financing them, if they had an application for a determination of suitability denied by the State Gaming Agency. (Pls.' Reply at 68; Pls.' Reply to St. Defs.' SUF at ¶ 23). These provisions might suggest that the State Gaming Agency is responsible for licensing most persons who work in or with Indian casinos. If true, this might satisfy the causation requirement because without the Director and the Commission fulfilling their licensing duties, tribal gaming might not have been possible.

Yet, a closer reading of the compacts reveals that the licensing responsibilities of the State Gaming Agency are relatively minor. Rather, the Tribal Gaming Agency has primary responsibility for issuing licenses to virtually every person who works in or with Indian casinos.[27] (Compact

---

**27.** Section 6.4.1 of the compacts states:

All persons in any way connected with the Gaming Operation or Facility who are required to be licensed or to submit to a background investigation under IGRA, and any others required to be licensed under

§ 6.4.1). Sections 6.4.4(b), 6.4.5, and 6.4.6, of the compacts merely prohibit the Tribal Gaming Agency from licensing persons who have had determinations of suitability denied by the State Gaming Agency, but they do not require persons working in or with tribal casinos to apply for licenses from the State Gaming Agency.[28] Thus, even if the licensing of such persons satisfied the causation requirement, the compacts themselves demonstrate that it is the actions of the Tribal Gaming Agency, and not the State Gaming Agency, that are fairly traceable to the plaintiffs' injuries.

Finally, even if they had established causation, plaintiffs have not demonstrated redressability. An injunction to prevent the State Gaming Agency from issuing or renewing determinations of suitability would do little to hamper the casinos' ability to operate because virtually all persons receive both their initial licenses and license renewals from the Tribal Gaming Agency.

2. *Count IV: Attorney General, Director, Commission and Penal Code Enforcement*

■ The state defendants offer two arguments as to why there is no causation with respect to count IV of the complaint which seeks to enjoin the Attorney General, the Director, and the Commission from enforcing Penal Code §§ 330, 330a, 330b, the state criminal law provisions that prevent the plaintiffs from offering class III gaming. First, the state defendants argue that there is no causal connection between the Attorney General and the alleged harm, class III gaming by Indian Tribes. (St. Defs.' Motion for Summary Judgment at 12–13). This argument, however, incorrectly treats the alleged harm under count IV as class III gaming by Tribes in violation of IGRA and the Equal Protection Clause, when the actual harm alleged here is the inequitable application of the Penal Code provisions to the plaintiffs thereby preventing them from offering class III gaming. (Complaint at 32–33). If the plaintiffs' allegations are correct, then they are entitled to seek this relief because the equal protection violation may be remedied either by prohibiting class III gaming as to every one, or by permitting it as to every one.[29]

The state defendants next argue that there is no causation because none of the individuals named in count IV, the Attorney General, the Director, and the Commission, has authority to prevent all enforcement of the Penal Code provisions, for example, by a District Attorney. (St. Defs.' Motion for Summary Judgment at

---

this Gaming Compact, including, but not limited to, all Gaming Employees and Gaming Resource Suppliers, and any other person having a significant influence over the Gaming Operation must be licensed by the Tribal Gaming Agency.

**28.** The compacts state that except for "non-key Gaming Employees," the Tribal Gaming Agency must require all license applicants to file an application with the State Gaming Agency for a determination of suitability for licensure under the California Gambling Control Act. *Id.* at § 6.5.6. The compacts, however, do not distinguish "non-key Gaming Employees" from "key Gaming Employees," and the plaintiffs have failed to provide any evidence to support a causal connection between

the State Gaming Agency's act of licensing these persons, "key Gaming Employees," and the plaintiffs' injuries.

**29.** The state defendants argue that the court should abstain from granting the plaintiffs' requested relief under *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971). (St. Defs.' Motion for Summary Judgment at 56). However, because *Younger* abstention is not jurisdictional, and because the plaintiffs are not entitled to injunctive relief under count IV, it is unnecessary to address the applicability of *Younger. See Benavidez v. Eu,* 34 F.3d 825, 829 (9th Cir.1994) (citing *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 358–59, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)).

13). This argument confuses causation analysis with redressability.[30] The question is not whether these defendants can prevent enforcement of the Penal Code provisions. Rather, the causation question is whether the alleged injury—the threatened or actual enforcement of the Penal Code provisions against the plaintiffs such that they are unable to offer the same class III gaming offered by the tribes—is fairly traceable to the state defendants. The history of letters written by the Attorney General and the Director to the plaintiffs and other California card clubs, as well as their interaction with local law enforcement officials adequately satisfies the causation requirement. "Here, there has clearly been a specific threat of prosecution ... [and] such an express threat instills a fear of criminal prosecution that cannot be said to be 'imaginary or wholly speculative.'" *Culinary Workers Union, Local 226 v. Del Papa*, 200 F.3d 614, 617 (9th Cir.1999).

Specifically, in 1988, then Attorney General Van De Kamp and the Manager of the Gaming Registration Program wrote to Artichoke Joe's stating that if Artichoke Joe's offered a game called "Texas hold-em," it would be in violation of Cal.Penal Code § 330 and "administrative action will be taken against [its] registration." (Van de Kamp, Watson Letter, Exh. O to Pls.' Motion). The letter was also sent to local law enforcement officials. (*Id.*) Similarly, in 1989, Attorney General Van de Kamp and the Director of the Division of Law Enforcement sent a notice to all "California Card Club Owners," a category that includes several of the plaintiffs, stating that if they offered "percentage games," they would be in "violation of the Penal Code and the Gaming Registration Act

which may result in administrative action on the part of the State Gaming Registration Program as well as possible criminal prosecution." (Van de Kamp, Clemens Letter, Exh. P to Pls.' Motion). Another letter that year addressed to "California Card Club Owners" again warned of administrative action and "possible criminal prosecution" if they offered "jackpot poker." (Van de Kamp, Clemens Letter, Exh. Q to Pls.' Motion). In 1997, Attorney General Lungren and the Manager of the Office of Gaming Registration notified all card club owners that percentage card games are illegal. (Van de Kamp, Letter Exh. R to Pls.' Motion). The letter was also sent to "All Affected Law Enforcement Agencies," and it stated that the Attorney General was requesting that "they monitor compliance to ensure that all gaming clubs are charging the proper fees of their patrons." (*Id.*)

Moreover, Attorney General Lockyer and the current Director of the Division of Gambling Control, Harlan Goodson, have published several law enforcement advisories on issues related to gambling. One advisory, sent to "All Police Chiefs and Sheriffs," described "Tab Force," an illegal bingo operation. (Tab Force Advisory, Exh. S to Pls.' Motion). The letter noted that although the Division of Gambling Control lacked jurisdiction over bingo operations, it could investigate suspected violations of state gambling laws and provide advice to local law enforcement agencies for use in the regulation of bingo. (*Id.*) The letter specifically advised law enforcement agencies that "Tab Force constitutes an unlawful gambling device within the meaning of sections 330b and 330.1 of the Penal Code." (*Id.*) In other advisories, the

---

**30.** Redressability is not a problem as to count IV. First, it is likely that the District Attorneys will follow the court's ruling, especially given their tendency to look to the Attorney General for policy on gaming. Second, for purposes of Article III, it is sufficient that redressability is likely; plaintiffs need not establish it with absolute certainty. *See infra* pp. 1107–09.

Attorney General and the Director discussed what constitutes a "Gaming Activity," the need for card clubs to report to the Division of Gambling Control the forms of gambling offered by the clubs, and the legality of "Jackpot Poker." (Exh. N to Pls.' Motion). On at least one occasion in 1998, the San Bruno District Attorney wrote to the Director to inquire about the legality of a specific gaming practice and whether it constituted an illegal percentage game. (Exh. T to Pls.' Motion). The District Attorney's letter specifically stated that Artichoke Joe's had requested an opinion on the game and that the District Attorney was seeking the opinion of the Division of Gaming Control because "[w]e need to have a uniform policy in the state in order that card clubs can have a level playing field upon which to conduct their games." (*Id.*)

As in *Culinary Workers Union, Local 226,* where the Ninth Circuit found a case or controversy because the Attorney General had written a letter specifically threatening to cause the statute to be enforced, the Attorney General and the Director have an unambiguous record of warning clubs of potential criminal prosecution and administrative action if they violate Penal Code provisions prohibiting class III gaming. They also have taken the lead in setting statewide policy with respect to gambling. Thus, the threat of criminal prosecution under the Penal Code provisions by these defendants, as well as administrative action, is not "'imaginary, speculative or chimerical.'" *Snoeck v. Brussa,* 153 F.3d 984, 987 (9th Cir.1998) (quoting *Shell Oil Co. v. Noel,* 608 F.2d 208, 213 (1st Cir.1979)). For these reasons, the plaintiffs have satisfied the Arti-

cle III causation requirement as to the Attorney General and the Director.

The plaintiffs have failed, however, to provide evidence demonstrating that the threat of enforcement of the Penal Code provisions is fairly traceable to the Commission. None of the documents provided by the plaintiffs bears the names of any of the members of the Commission. Thus, although the Commission may well be empowered to revoke plaintiffs' gaming licenses if they violate the Penal Code provisions, the plaintiffs have done nothing more than restate their original allegations to this effect. This is insufficient to survive a motion for summary judgment. *Los Angeles County Bar Ass'n v. Eu,* 979 F.2d 697, 700 (9th Cir.1992) ("At the summary judgment stage, the plaintiff must set forth specific facts, rather than mere allegations, that if true would suffice to establish standing.").

In summary, as to causation, the court finds that with respect to count II, plaintiffs have satisfied the causation requirement as to the Governor, but not the Director or the Commission. With respect to count IV, plaintiffs have satisfied the causation element as to the Attorney General and the Director, but not the Commission.[31]

**C. Redressability: Governor and Count II**

 To establish redressability, plaintiffs must show that it is "likely, as opposed to merely speculative that the injury will be redressed by a favorable decision." *Bernhardt v. County of Los Angeles,* 279 F.3d 862, 869 (9th Cir.2002). A "claim may be too speculative if it can be redressed only through 'the unfettered choices made by independent actors not

---

**31.** For similar reasons, the claim against the Director and the Commission does not meet the causation requirement of *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) as to count II, and the claim against the Commission does not meet this requirement as to count IV.

before the court.'" *Id.* (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). However, a plaintiff can still satisfy the redressability requirement in such a case by meeting "the burden ... to adduce facts showing that those choices have been or will be made in such manner as to ... permit redressability of injury." *Lujan,* 504 U.S. at 562, 112 S.Ct. 2130. Thus, in *Franklin v. Massachusetts,* 505 U.S. 788, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992), decided less than two weeks after *Lujan,* the Court held that the plaintiffs satisfied redressability in a suit brought against the Secretary of Commerce to require her to reallocate the apportionment of overseas military personnel in the 1990 census, even though the President would make a final determination on the census. A plurality of the Court held that declaratory relief against the Secretary would redress the plaintiffs' injuries because "she has an interest in litigating [the census's] accuracy ... [and] it is substantially likely that the President and other executive and congressional officials would abide by an authoritative interpretation of the census statute and constitutional provision by the District Court, even though they would not be directly bound by such a determination." *Id.* at 803, 112 S.Ct. 2767. Therefore, although redressability depended at least in part on the actions of third parties, the Court was satisfied that the third parties would follow and enforce the law thus making redressability likely.[32]

As to count II and the IGRA and equal protection claims on the existing

compacts, the state defendants contend that redressability is too speculative to support standing because the tribes are not parties to the suit and a decision in the plaintiffs' favor would, therefore, not be binding on them. (St. Defs.' Motion for Summary Judgment at 13). Moreover, they argue that if the court invalidates the compacts and Proposition 1A, the State would lose its power to stop any continued class III gaming because, in the absence of a valid IGRA-sanctioned compact, 18 U.S.C. § 1166 gives the federal government exclusive enforcement authority over Indian gaming. (*Id.* at 13–14). *See United States v. E.C. Investments, Inc.,* 77 F.3d 327, 330 (9th Cir.1996) ("Section 1166(d) grants the United States 'exclusive jurisdiction over criminal prosecutions of violations of State gambling laws that are made applicable under this section to Indian country.'"). Thus, the state defendants contend that if the plaintiffs prevail on the merits, the state defendants will be powerless to stop any illegal Indian gaming.

The state defendants' arguments are misplaced for several reasons. First, the plaintiffs do not need to prove a negative, namely that the tribes would not engage in illegal gaming in order to demonstrate redressability. If plaintiffs had to "negate ... speculative and hypothetical possibilities ... in order to demonstrate the likely effectiveness of judicial relief," they would rarely ever be able to establish standing. *Duke Power Co. v. Carolina Envtl. Study Group,* 438 U.S. 59, 73, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978).

32. *See also Made in the USA Foundation v. United States,* 242 F.3d 1300, 1306–11 (11th Cir.2001) (finding redressability in suit challenging constitutionality of the North American Free Trade Agreement and that even though President could not be ordered to terminate participation in NAFTA, judicial order would be followed by subordinates); *Los Angeles County Bar Ass'n,* 979 F.2d at 701 (redressability requirement was satisfied in suit against Governor and Secretary of State claiming injury due to lack of judges in Los Angeles County because it was substantially likely that the California legislature, although its members were not parties to the action, would abide by the court's declaration) (citing *Franklin,* 505 U.S. at 803, 112 S.Ct. 2767).

Second, even if the tribes were inclined to violate IGRA and state penal code prohibitions, there is no reason to assume that the federal government would shirk its enforcement responsibilities under 18 U.S.C. § 1166 by countenancing illegal class III gaming by Indian tribes. Thus, although redressability may depend, at least in part, on the actions of third parties, this case more closely resembles *Franklin* than it does *Lujan*. Indeed, unlike in *Lujan* where it was unclear whether outside agencies would be bound by the Secretary of the Interior's interpretation to require consultation for international projects, a ruling that invalidates the compacts and Proposition 1A would conclusively establish the illegality of any continued class III gaming by Indian tribes. *Lujan*, 504 U.S. at 555, 112 S.Ct. 2130. The sole contingency, therefore, would be whether the federal authorities responsible for prosecuting illegal gaming would do so, and, as in *Franklin, Made in the USA*, and *E.C.*, the court is entitled to expect that they will follow the law.

Because "[p]laintiffs need not demonstrate that there is a 'guarantee' that their injuries will be redressed by a favor-

able decision," it is likely, and not merely speculative, that a declaratory judgment invalidating the existing compacts and Proposition 1A would redress the plaintiffs' injuries. *Graham v. Fed. Emergency Mgmt. Agency*, 149 F.3d 997, 1003 (9th Cir.1998); *see also Competitive Enter. Inst. v. National Highway Traffic Safety Admin.*, 901 F.2d 107, 117–18 (D.C.Cir. 1990) ("Petitioners need not prove that granting the requested relief is certain to redress their injury, especially where some uncertainty is inevitable.").

Therefore, the court concludes that the plaintiffs have demonstrated that a favorable ruling would likely redress their alleged injuries.

### III. Ex Parte Young [33]

The *Ex parte Young* exception to the Eleventh Amendment permits suits for prospective declaratory or injunctive relief if suit is brought against a state official acting in an official capacity. *Ex parte Young*, 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). The "obvious fiction" of *Ex parte Young*, however, only stretches so far and is subject to several constraints. *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 270, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997).[34] For example, *Young* may not be

---

**33.** The analysis in this section also applies to the state defendants' arguments, (St. Defs.' Motion for Summary Judgment at 42–44), that they are not liable under 42 U.S.C. § 1983 because they were not personally involved in the alleged violations of federal law. *See Jones v. Williams*, 286 F.3d 1159, 1163 (9th Cir.2002) (noting that there is no respondeat superior liability under § 1983 and that claim must be predicated on defendant's personal action). Because the personal involvement requirement for § 1983 and the causal connection requirement for *Young* are so similar, and largely serve the same purposes, the court's determination that the state defendants may be sued under *Young* also establishes that they are proper defendants under § 1983.

**34.** The constraints on *Ex parte Young* imposed by *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996), and *Idaho v. Coeur d'Alene Tribe*, 521 U.S. 261, 117 S.Ct. 2028, 138 L.Ed.2d 438 (1997), do not apply in this case. First, Congress did not create a detailed remedial scheme to enforce section 2710(d)(1), which permits class III gaming on certain conditions, unlike the provisions of IGRA which the Court held could not be enforced by an *Ex parte Young* action in *Seminole Tribe*, 517 U.S. at 74, 116 S.Ct. 1114. Second, *Coeur d'Alene* does not apply because a decision favorable to the plaintiffs would not implicate California's special sovereignty interests. *See Agua Caliente Band of Cahuilla Indians v. Hardin*, 223 F.3d 1041, 1048 (9th Cir.2000) ("We start with the principle that the *Young* doctrine is alive and well and that *Coeur d'Alene* ad-

invoked to provide declaratory relief against a state official for a wholly past violation of federal law, *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), unless accompanied by an ongoing violation of federal law. *Papasan v. Allain,* 478 U.S. 265, 282, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). Another important limit on *Young* is the causation requirement. As the Court explained in *Young,* not every state officer is subject to suit simply by virtue of being a state officer. Rather, the "officer must have some connection with the enforcement of the act, or else it is merely making him a party as a representative of the State, and thereby attempting to make the State a party." *Ex parte Young,* 209 U.S. at 157, 28 S.Ct. 441. Further, the "connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit." *Los Angeles County Bar Ass'n v. Eu,* 979 F.2d 697, 704 (9th Cir. 1992). However, a plaintiff's failure to link a state officer's actions to a specific enforcement proceeding will not preclude a *Young* suit if the conduct does not generally give rise to enforcement proceedings, and the state officer is shown to have a direct connection to the alleged harm. *Compare Snoeck v. Brussa,* 153 F.3d 984, 987 (9th Cir.1998) (Nevada Commission on Judicial Discipline was not a proper defendant under *Young* because it lacked a direct connection to enforcement proceedings where challenged conduct included potential contempt of court that could only be imposed by Nevada Supreme Court), *with Los Angeles County Bar Ass'n,* 979

F.2d at 704 (Governor and Secretary of State were proper defendants under *Young,* notwithstanding absence of their direct connection to enforcement proceedings, because the challenged conduct did not give rise to such proceedings and they had a direct connection to the alleged harm).

### A. Count II: Existing Compacts as to Governor, Director, and Commission

 The Governor is a proper party subject to suit under the *Young* doctrine because the plaintiffs' claims are "not based on any general duty to enforce state law." *Id.* Rather, the Governor is alleged to have "a specific connection to the challenged statute." *Id.* Indeed, for the same reasons that the Governor is claimed to have caused the plaintiffs' alleged injuries for purposes of Article III standing, he is also a proper defendant under *Young:* The Governor negotiated and approved the compacts that give rise to the plaintiffs' alleged injuries. *Culinary Workers Union, Local 226,* 200 F.3d at 619 (applying Article III causation analysis to *Young* ); *Deida v. City of Milwaukee,* 192 F.Supp.2d 899, 916–17 (E.D.Wis.2002) (causal connection requirement under *Young* "closely overlap[s] with the causation and redressability inquiries for standing"). If the plaintiffs' allegations are correct, the Governor violated federal law— IGRA and the Equal Protection Clause— his actions are ultra vires, and he is subject to suit under *Young.*

Moreover, although the Governor's conduct that gave rise to the claimed violations of federal law has already occurred,

dressed a unique, narrow exception not present here. We do not read *Coeur d'Alene* to bar all claims that affect state powers, or even important state sovereignty interests."). Finally, because the Ninth Circuit has held that "[t]he viability of *Ex parte Young* as traditionally applied survives the Supreme Court's

treatment of the issue in *Idaho v. Coeur d'Alene Tribe,"* there is no need to consider whether plaintiffs may bring an action under *Young* when a state forum is available to litigate their federal claims. *Id.* at 1050 (quoting *Doe v. Lawrence Livermore Nat'l Lab.,* 131 F.3d 836, 839 (1997)).

declaratory relief remains an appropriate remedy under *Young* because the plaintiffs allege ongoing violations of federal law due to the Governor's approval of the compacts. In *Papasan* the Court addressed the viability of *Young* in actions for declaratory relief based on past conduct that gives rise to an ongoing violation. The plaintiffs challenged Mississippi's system of funding public schools in areas that had received federal school land grants. The lands had long since been sold by the State, and a substitute appropriation made, but the schools in areas where the land had been sold received less money for their schools from the appropriation than they would have if the lands had been retained. The plaintiffs alleged that Mississippi's past actions in selling the lands caused the present disparity in school funding that violated the state's trust responsibilities and the Equal Protection Clause. While finding that the alleged trust violation was the kind of wholly past violation and request for restitution that would not survive the Eleventh Amendment, the Court agreed that the Equal Protection claims fell within *Young*: "This alleged ongoing constitutional violation— the unequal distribution by the State of the benefits of the State's school lands—is precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young*." *Papasan*, 478 U.S. at 282, 106 S.Ct. 2932.

As in *Papasan*, the plaintiffs also allege ongoing violations of federal law. They argue that the compacts now in effect violate IGRA and the Equal Protection Clause and place them at a disadvantage. The plaintiffs' alleged injuries from their inability to compete continue until the compacts come to an end, which might not be until 2020. (Compact at § 11.2.1).

Thus, as in *Papasan*, *Young* applies because the Governor's past approval of the compacts also causes ongoing claimed violations of federal law that presently harm the plaintiffs. *Papasan*, 478 U.S. at 282, 106 S.Ct. 2932 ("the essence of the equal protection allegation is the present disparity in the distribution of the benefits of state-held assets and not the past actions of the State").

**B.** *Count IV: Penal Code Enforcement and Attorney General, Director, and Commission*

■ Plaintiffs may also rely on the *Young* doctrine to pursue their claims against the Attorney General and the Director of the Division of Gambling Control to enjoin enforcement of the Penal Code provisions. For the same reasons that the claim against the Attorney General and the Director satisfies the Article III causation requirement, the claim also meets the causal connection requirement under *Young*: The Attorney General and the Director have repeatedly warned plaintiffs not to violate the relevant Penal Code provisions barring Las Vegas style gambling. Thus, unlike in *Long v. Van de Kamp*, 961 F.2d 151 (9th Cir.1992) and *Southern Pacific Transp. Co. v. Brown*, 651 F.2d 613 (9th Cir.1980), the Attorney General and the Director are not being sued solely because they have general supervisory responsibilities to enforce state law. To the contrary, as in *Culinary Workers Union, Local 226*, they have made specific warnings of criminal prosecution and administrative action. Therefore, the Attorney General and the Director have a sufficient causal connection to the enforcement of the statute for purposes of *Young*.[35]

---

**35.** Similarly, the Commission lacks a causal connection to the plaintiffs' injuries for the same reason that its actions are not "fairly traceable" for purposes of Article III standing.

Thus, the court concludes that as to count II, plaintiffs may bring an action under *Ex parte Young* against the Governor. As to count IV, plaintiffs may bring an *Ex parte Young* suit against the Attorney General and the Director.

## IV. Administrative Procedure Act [36]

The federal defendants pose the next series of jurisdictional questions by challenging plaintiffs' standing and the availability of judicial review under the APA. The APA creates a cause of action for persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute," 5 U.S.C. § 702, except to the extent the relevant statute "preclude[s] judicial review" or the agency action "is committed to agency discretion." 5 U.S.C. §§ 701(a)(1), (2). The federal defendants argue that in the case of IGRA and the Johnson Act, both §§ 701(a)(1) and (2) apply to preclude judicial review of the plaintiffs' claims under the APA. The federal defendants also contend that the plaintiffs lack standing to sue under § 702 of the APA because they are not within the zone of interests sought to be protected by IGRA and the Johnson Act.

### A. *Section 701(a)(1)*

 The APA creates a "right of action" to challenge final agency action that is presumptively available even without "[a] separate indication of congressional intent to make agency action reviewable under the APA." *Japan Whaling Ass'n v. American Cetacean Soc'y,* 478 U.S. 221,

230 n. 4, 106 S.Ct. 2860, 92 L.Ed.2d 166 (1986). Because of this "strong presumption," *Bowen v. Michigan Acad. of Family Physicians,* 476 U.S. 667, 670, 106 S.Ct. 2133, 90 L.Ed.2d 623 (1986), the court may find that IGRA and the Johnson Act "preclude judicial review" according to § 701(a)(1) only if there is "clear and convincing evidence" that Congress intended to foreclose the availability of an APA remedy. *Block v. Community Nutrition Inst.,* 467 U.S. 340, 348, 350, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). The term "clear and convincing evidence," however, is something of a misnomer since it does not refer to a quantum of evidence "in the strict evidentiary sense." *Id.* at 350, 104 S.Ct. 2450. "Rather, the Court has found the standard met, and the presumption favoring judicial review overcome, whenever the congressional intent to preclude judicial review is 'fairly discernible in the statutory scheme.'"[37] *Id.* at 351, 104 S.Ct. 2450 (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). Specifically, the court should find the necessary intent to preclude review if review would permit plaintiffs to "evade the statutorily envisioned review mechanisms in favor of those established by the APA." *Overton Power Dist. No. 5 v. O'Leary,* 73 F.3d 253, 256 (9th Cir.1996).

 There is nothing in the relevant structure of IGRA or the Johnson Act to suggest that Congress intended to preclude the type of APA review sought here

---

**36.** It is unnecessary to reach the federal defendants' arguments as to count III and the Lytton Rancheria because only the state defendants are named in that count.

**37.** According to *Community Nutrition Institute,* Congress' intent to overcome the presumption in favor of judicial review of agency action under § 701(a)(1) is revealed by "(1) specific statutory language, (2) specific legislative history, (3) contemporaneous judicial

construction followed by congressional acquiescence, (4) the collective import of the legislative and judicial history of the statute, and (5) inferences drawn from the statutory scheme as a whole." 3 K. Davis & R. Pierce, Jr., *Administrative Law Treatise* § 17.8 at 153–54 (3d ed.1994). The court only considers inferences drawn from the statutory scheme because there is no suggestion or evidence that any of the other four categories noted in *Community Nutrition Institute* apply.

by the plaintiffs. Unlike *Community Nutrition Institute* where the availability of an APA cause of action for milk consumers would have undermined detailed procedures milk processors had to follow in order to challenge milk prices under the Agricultural Marketing Agreement Act of 1937, 7 U.S.C. § 601 *et seq.*, allowing plaintiffs' APA claims will not frustrate the regulatory structure of either IGRA or the Johnson Act.[38] The federal defendants are correct that IGRA contemplates a multitude of specific causes of action that may be brought by specified entities or persons. *See Florida v. Seminole Tribe of Florida,* 181 F.3d 1237, 1248 (1999) (listing causes of action created by IGRA including 25 U.S.C. § 2710(d)(7)(A)(ii) (authorizing state or tribal suit to enjoin class III gaming conducted in violation of compact); 25 U.S.C. § 2710(d)(7)(A)(iii) (authorizing suit by Secretary of Interior to enforce procedures for conducting class III gaming); 25 U.S.C. § 2711(d) (authorizing tribal suit to compel Chairman of the NIGC either to approve or to disapprove management contract); 25 U.S.C. § 2713(a)(2), (b)(2) (creating right to hearing before NIGC regarding fine imposed or temporary closure ordered by Chairman); 25 U.S.C. §§ 2713(c), 2714 (authorizing appeal to district court of NIGC fines, permanent closure orders, and certain other decisions)). But the inclusion of remedies in IGRA for specific entities or persons only supports an inference that Congress intended to preclude others from bringing the same kind of claims under the APA. As the Court observed in *Community Nutrition*

*Institute,* 467 U.S. at 349, 104 S.Ct. 2450, "when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly concluded."

Thus, the federal defendants' implicit reliance on the legal maxim expressio unius est exclusio alterius—the expression of one implies the exclusion of others—to argue that the inclusion of specific remedies for some parties impliedly precludes all other parties and all other APA claims is not warranted. (Fed. Defs.' Motion at 33–35). The starting point of preclusion analysis is "the strong presumption that Congress intends judicial review of administrative action." *Bowen,* 476 U.S. at 670, 106 S.Ct. 2133. This presumption is inconsistent with the federal defendants' reliance on a robust expressio unius doctrine because it would create the reverse presumption, one against APA review for most statutes.

Nor have the federal defendants demonstrated that the plaintiffs' APA claims would undermine IGRA or the Johnson Act. Noticeably absent from the list of IGRA-created remedies is one that addresses the type of claim brought by the plaintiffs—a mechanism for challenging the Secretary's approval of a compact on the basis that the compact violates IGRA.[39] In the absence of an explicit remedy under IGRA, permitting plaintiffs to proceed under the APA would not encourage parties to circumvent statutorily envisioned review

---

**38.** Similarly, the federal defendants' reliance on *Morris v. Gressette,* 432 U.S. 491, 97 S.Ct. 2411, 53 L.Ed.2d 506 (1977) for the proposition that litigation-induced delays in agency approval procedures might preclude judicial review is misplaced. (Fed. Defs.' Motion at 36). Unlike the sections of the Voting Rights Act reviewed in *Morris,* there are no comparable provisions in IGRA indicating congressional concern with timing or delay.

**39.** Federal defendants concede in their Reply that they do not contest the plaintiffs' use of the APA to object to the Secretary's actions on constitutional grounds. (Fed. Defs.' Reply at 28). *See Webster v. Doe,* 486 U.S. 592, 603, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988) (noting that Congress must be especially clear when it intends to foreclose judicial review of constitutional claims under a particular statute).

mechanisms, and, therefore, "the general presumption favoring judicial review of administrative action is controlling." [40] *Community Nutrition Institute,* 467 U.S. at 351, 104 S.Ct. 2450.

For these reasons, the·plaintiffs' claims under the APA are not precluded by § 701(a)(1).[41]

B. *Section 701(a)(2)*

 In contrast to the strong presumption that agency action is subject to judicial review under the APA, there is a contrary presumption against judicial review of an agency's decision not to undertake an enforcement action because such decisions are generally committed to agency discretion. *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985) (no APA cause of action to review Food and Drug Administration decision not to take enforcement actions under Food, Drug and Cosmetic Act, 21 U.S.C. § 301 *et seq.*). The logic of *Chaney* is that judicial review of agency decisions not to take enforcement action is generally precluded under § 701(a)(2) because such decisions involve "a complicated balancing of a number of factors which are peculiarly within

40. The federal defendants' insistence that the absence of an implied private right of action under IGRA precludes the plaintiffs' APA claims is equally unavailing. (Fed. Defs.' Motion at 31). The defendants are correct that there is no evidence that Congress intended a private right of action to enforce IGRA. *Florida v. Seminole Tribe of Florida,* 181 F.3d 1237, 1245–50 (11th Cir.1999) (no private right of action under IGRA); *Tamiami Partners v. Miccosukee Tribe of Indians,* 63 F.3d 1030, 1049 (11th Cir.1995) (same). However, it is well-established that an APA claim is available even in the absence of an implied private cause of action. *See Hein v. Capitan Grande Band of Diegueno Mission Indians,* 201 F.3d 1256, 1260–61 (9th Cir.2000) (tribe lacked private right of action under IGRA but could proceed under APA); *Oregon Natural Res. Council v. United States Forest Serv.,* 834 F.2d 842, 851 (9th Cir.1987) ("an implied private right of action under a violated statute is not a necessary predicate to a right of action under the APA"); *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit Dist.,* 752 F.2d 373, 377 (9th Cir.1985) (same). This is a predictable outcome because there is a strong presumption that Congress intended judicial review of agency action under the APA, while courts presume that Congress did not intend implied private rights of action. *Compare Japan Whaling Ass'n,* 478 U.S. at 230 n. 4, 106 S.Ct. 2860 (noting that right of action is available under the APA "absent some clear and convincing evidence of legislative intent to preclude review") *with Cannon v. University of Chicago,* 441 U.S. 677, 731, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (Powell, J., dissenting) ("Absent the most compelling evidence of affirmative congressional intent, a federal court should not infer a private cause of action.").

41. The federal defendants argue that two cases, *Jackson v. United States,* 485 F.Supp. 1243 (D.Alaska 1980) and *San Xavier Dev. Auth. v. Charles,* 237 F.3d 1149 (9th Cir. 2001), hold that the plaintiffs do not have a remedy under the APA because "there is no substantive right for third party review of Indian contracts." (Federal Defs.' Reply at 30). Neither case, however, states such a broad holding. First, *Jackson* is not binding authority, and the court found that there was no APA claim because the plaintiffs had not independently established subject matter jurisdiction. *Jackson,* 485 F.Supp. at 1249. Here, as in virtually all cases brought under the APA, "subject only to preclusion-of-review statutes created by Congress," federal jurisdiction is provided by 42 U.S.C. § 1331. *Califano v. Sanders,* 430 U.S. 99, 106, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977); Complaint at ¶ 2 (stating that jurisdiction for the APA claim is based on 28 U.S.C. § 1331); *see also Robbins v. Reagan,* 780 F.2d 37, 43 (D.C.Cir.1985) (applying *Califano;* "district court always has jurisdiction to review federal administrative action under 28 U.S.C. § 1331"). Because neither IGRA nor the Johnson Act contains a preclusion of review provision, the court has subject matter jurisdiction under 28 U.S.C. § 1331, and the plaintiffs have a cause of action under the APA. Second, *San Xavier Development Authority,* involved an entirely different statutory scheme and, therefore, is not binding authority as to APA claims under IGRA.

[the agency's expertise]" and because "review is not to be had if the statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* at 830, 105 S.Ct. 1649. Section 701(a)(2), however, represents "a very narrow exception" to judicial review of administrative action. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971).

 Section 701(a)(2) and *Chaney* do not apply here for several reasons, not the least of which is that plaintiffs do not challenge an agency's failure to enforce a statute. (Fed. Defs.' Motion at 37–39). Under IGRA, a class III gaming compact is not valid until it is approved by the Secretary of the Interior and published in the Federal Register. *See* 25 U.S.C. § 2710(d)(3)(B). In this case, the Secretary of the Interior approved California's gaming compacts with the Indian tribes and it is this decision that is the subject of the plaintiffs' APA claim. (Complaint at ¶ 72) ("The approval of the Tribal–State Compacts by the Federal Defendants' predecessors violates IGRA."). Therefore, because the plaintiffs seek review of agency action, as opposed to a discretionary decision to forego enforcement of a statute, neither *Chaney* nor § 701(a)(2) bars review of the plaintiffs' claims. *See Robbins,* 780 F.2d at 45 ("Th[e] requirement of an amplified level of discernible standards controlling the agency's discretion is not applied, however, where agency action not analogous to enforcement decisions is involved.").

The federal defendants also present an argument that is a variation on the traditional objection to judicial review under *Chaney.* The argument is somewhat confusing but seems to go something like this: Because tribes with a compact are not parties to this lawsuit and are not bound by what the court decides, a ruling that

the federal defendants' decision to approve the compacts was contrary to law could only be implemented at this point through the discretionary decision of the NIGC to enforce IGRA. (Fed. Defs.' Motion at 37–39). As a matter of APA law, this argument misses the mark because the plaintiffs do not currently seek judicial review of a decision to forego enforcement. Further, the court should not reject the plaintiffs' APA claims based on the assumption that a federal agency might not enforce the law in some future proceeding. *See supra* pp. 1107–09.

What the federal defendants style as an invocation of the "committed to agency discretion" provision of § 701(a)(2) really amounts to a contention that the plaintiffs lack Article III standing because redressability depends on the discretionary enforcement decisions of a third party and these decisions are not themselves the subject of review under the APA.

The Supreme Court considered, and rejected, a similar argument in *Federal Election Comm'n v. Akins* 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998). In *Akins,* the plaintiffs were voters who challenged the FEC's conclusion that under the Federal Election Campaign Act of 1971, 2 U.S.C. § 431, the American–Israel Political Action Committee ("AIPAC") was not a "political committee." A contrary determination would have given rise to various recordkeeping and disclosure requirements. The FEC argued that plaintiffs could not establish redressability because even if the Supreme Court reversed its decision, the FEC could still exercise its discretion and decline to pursue an enforcement action against AIPAC. Rejecting this argument the Court held that there was standing, because

those adversely affected by a discretionary agency decision generally have standing to complain that the agency

based its decision upon an improper legal ground. If a reviewing court agrees that the agency misinterpreted the law, it will set aside the agency's decision and remand the case—even though the agency ... might later, in the exercise of its lawful discretion, reach the same result for a different reason.[42]

*Id.* at 24, 118 S.Ct. 1777.

The Court's reasoning in *Akins* is equally applicable here. A decision that the Secretary of the Interior's approval of California's gaming compacts was contrary to law might result in continued class III gaming on Indian lands that can only be stopped by the NIGC, an agency under the purview of the Secretary of the Interior. 25 U.S.C. § 2704. Under *Chaney,* the court might be precluded from reviewing a decision of the NIGC to refuse to take steps under IGRA against illegal tribal gaming. However, even were this the case, this future contingency does not destroy redressability for the plaintiffs' claim against the Secretary's approval of gaming compacts. Indeed, *Akins* demonstrates that "[r]edressability does not require a plaintiff to establish that the defendant agency will actually exercise its discretion in any particular fashion in the future." *West Virginia Highlands Conservancy v. Norton,* 137 F.Supp.2d 687, 698 (S.D.W.Va. 2001); *see also Animal Legal Defense Fund, Inc. v. Glickman,* 154 F.3d 426 (D.C.Cir.1998) ("The Supreme Court's recent decision in *FEC v. Akins,* moreover, rejects the possible counter argument that the redressability element of constitutional standing requires a plaintiff to establish that the defendant agency will actually enforce any new binding regulations against the regulated third party."). For these reasons, *Chaney* and § 701(a)(2) do not apply here to foreclose judicial review of the federal defendants' actions.

## C. *Section 702—Zone of Interest Test*

■ Section 702 of the APA states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. The Supreme Court has interpreted § 702 "to impose a prudential standing requirement in addition to the requirement, imposed by Article III of the Constitution, that a plaintiff have suffered a sufficient injury in fact." *National Credit Union Administration v. First National Bank & Trust Co.,* 522 U.S. 479, 488, 118 S.Ct. 927, 140 L.Ed.2d 1 (1998)("*National Credit Union* "). To demonstrate standing under the APA, a plaintiff "must ... show that the interests it seeks to protect are 'arguably within the zone of interests to be protected' by the statute in question." *Yesler Terrace Cmty. Council v. Cisneros,* 37 F.3d 442, 445 (9th Cir.1994) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)("*Data Processing* ")).

The Court has indicated that there is no "clear rule for determining when a plaintiff" falls within the zone of interests to be protected by a statute. "[I]n applying the ... test ... we first discern the interests 'arguably ... to be protected' by the statutory provision at issue; we then inquire whether the plaintiff's interests affected by the agency action in question are among them." *National Credit Union,* 522 U.S. at 488, 492, 118 S.Ct. 927. However, "[t]he test is not meant to be especially demand-

---

**42.** Although these statements were made specifically in the context of the causation requirement, the Court applied the identical analysis to the redressability question. *Akins,* 524 U.S. at 25, 118 S.Ct. 1777 ("[f]or similar reasons, the courts in this case can 'redress' 'injury in fact' ").

ing; in particular, there need be no indication of congressional purpose to benefit the would-be plaintiff." *Clarke v. Securities Indus. Ass'n,* 479 U.S. 388, 399–400, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987). Rather, "APA plaintiffs need only show that their interests fall within the 'general policy' of the underlying statute, such that interpretations of the statute's provisions or scope could directly affect them." *Graham,* 149 F.3d at 1004.

■■■ The plaintiffs' interests here are not so "marginally related to or inconsistent with the purposes implicit in the statute" that they lack prudential standing. *Clarke,* 479 U.S. at 399, 107 S.Ct. 750. The provision of IGRA in question, 25 U.S.C. § 2710(d)(1)(B), states that class III gaming activities are only lawful on Indian lands if such activities are "located in a State that permits such gaming for any purpose by any person, organization,

or entity." Interpretation of this statutory language could directly affect plaintiffs' interests because, if plaintiffs' interpretation is correct, either the challenged compacts are invalid or plaintiffs must also be permitted to offer class III gaming. Either outcome directly affects their interests.

Moreover, by requiring that some gaming be permitted by the state as a precondition for a class III tribal gaming compact, § 2710(d)(1)(B), as interpreted by plaintiffs, arguably manifests a desire to foster some degree of competition, and plaintiffs are among the tribes' competitors.[43] The Court has repeatedly held that competitors fall within the zone of interests of provisions that are concerned with competition.[44] *See Data Processing,* 397 U.S. 150, 90 S.Ct. 827; *Arnold Tours, Inc. v. Camp,* 400 U.S. 45, 91 S.Ct. 158, 27 L.Ed.2d 179 (1970)(per curiam); *Investment Co. Inst. v. Camp,* 401 U.S. 617, 91

---

**43.** Although the zone of interests test may implicate the court's decision on the merits, it is important to remember that the two are distinct. *See Von Aulock v. Smith,* 720 F.2d 176, 185 (D.C.Cir.1983) ("some inquiry into the merits is necessary in a variety of situations presenting justiciability questions—those involving, for example, the 'zone of interests' test for standing"). The court's finding that the plaintiffs fall within the zone of interests "arguably" sought to be protected by IGRA does not mean that the plaintiffs must also prevail on "the argument" over statutory interpretation; "were that so, the zone of interests test would not merely implicate but would duplicate the merits." *National Coal Ass'n v. Hodel,* 825 F.2d 523, 527 (D.C.Cir. 1987) (trade associations had standing to challenge restrictions on coal leasing under Mineral Leasing Act and whether Secretary of Interior considered competition; restrictions on leasing permissible and Secretary's consideration of competition adequate). *See, e.g., Clarke v. Securities Industry Ass'n,* 479 U.S. 388, 107 S.Ct. 750, 93 L.Ed.2d 757 (1987) (finding standing but rejecting claim on the merits). The zone of interest test merely determines if the plaintiff is entitled to seek relief under the APA. Therefore, although the plaintiffs have an interest in competition that

is arguably protected by IGRA and that permits them to bring a claim under the APA, this does not mean that they necessarily prevail on the merits. In fact, they do not, although their claim is at least colorable.

**44.** The federal defendants argue that *Air Courier Conference v. American Postal Workers,* 498 U.S. 517, 111 S.Ct. 913, 112 L.Ed.2d 1125 (1991), demonstrates that competitors lack prudential standing under the APA. (Fed. Defs.' Reply at 25–26). In that case, the Court held that the interest of postal workers in maximizing their employment opportunities was not within the zone of interests to be protected by the postal monopoly statutes. *Id.* at 519, 111 S.Ct. 913. However, as the Court explained in *National Credit Union,* the statute challenged in *Air Courier Conference* had exclusive purposes: to increase postal revenues and to ensure that postal services were provided in a manner consistent with the public interest. *National Credit Union,* 522 U.S. at 498, 118 S.Ct. 927. Because the Act's purposes were exclusive, the postal employees' claims could not fall within the zone of interests protected by the statute. *Id.* This essential aspect of *Air Courier Conference* is missing here.

S.Ct. 1091, 28 L.Ed.2d 367 (1971); *Clarke,* 479 U.S. 388, 107 S.Ct. 750; *National Credit Union,* 522 U.S. 479, 118 S.Ct. 927, 140 L.Ed.2d 1.

In sum, it is at least arguable that the plaintiffs are among the competitors protected by the language of § 2710(d)(1)(B). Accordingly, they have standing under the APA to challenge the Secretary's action.

### V. Failure to Join Indian Tribes as Indispensable Parties

■ The final argument on the court's jurisdiction comes from amicus curiae California Nations Indian Gaming Association ("CNIGA"). CNIGA argues that the complaint must be dismissed in its entirety because the plaintiffs failed to join California's sixty-one Indian tribes who are necessary and indispensable parties under Fed.R.Civ.P. 19. A two part test applies to motions to dismiss for failure to join necessary and indispensable parties. *Washington v. Daley,* 173 F.3d 1158, 1167 (9th Cir.1999). First, the court must decide if the tribes are necessary to the suit. If the tribes are necessary, and if they cannot be joined, the court must determine if they are " 'indispensable' so that in 'equity and good conscience' the suit should be dismissed. The inquiry is a practical one and fact specific, and is designed to avoid the harsh results of rigid application. The moving party has the burden of persuasion in arguing for dismissal." *Makah Indian Tribe v. Verity,* 910 F.2d 555, 558 (9th Cir.1990) (citations omitted). Because the tribes' interests are adequately represented by the Secretary, the court denies the motion to dismiss under Rule 19.

■ First, an absent party is necessary if complete relief is not possible among those already parties to the suit, or if the absent party has a "nonfrivolous claim" to a legally protected interest in the suit. *Shermoen v. United States,* 982 F.2d 1312, 1317 (9th Cir.1992); Fed. R.Civ.P. 19(a)(1), (2). The Ninth Circuit

has repeatedly held that "a district court cannot adjudicate an attack on the terms of a negotiated agreement without jurisdiction over the parties to that agreement." *Clinton v. Babbitt,* 180 F.3d 1081, 1088 (9th Cir.1999) (as party to agreement with United States, complete relief impossible without Hopi Tribe); *see also Manybeads v. United States,* 209 F.3d 1164, 1165 (9th Cir.2000) (same). With respect to the current compacts, the tribes have legal interests at stake in the litigation since they will lose their compact rights to conduct class III gaming if the plaintiffs prevail. *See Washington v. Daley,* 173 F.3d at 1167 (holding that Indian tribes were necessary parties in challenge to regulation promulgated by Secretary of Commerce that increased tribes' fishing quota because adverse ruling would terminate tribes' fishing rights).

■ However, although the tribes can claim a legal interest in this lawsuit, they are not necessary parties because their legal interest can be adequately represented by the Secretary. (*Id.*) ("As a practical matter, an absent party's ability to protect its interest will not be impaired by its absence from the suit where its interest will be adequately represented by existing parties to the suit."). An existing party may adequately represent the interests of an absent party if (1) the present party will undoubtedly make all of the absent party's arguments, (2) the present party is capable and willing to make the absent party's arguments, and (3) the absent party would not offer any necessary elements that the present parties would neglect. *Shermoen,* 982 F.2d at 1318. In general, the United States' trust obligations to the Indian tribes, which the Secretary has a statutory duty to protect, 25 U.S.C. § 2710(d)(8)(B)(Secretary may disapprove compact if it violates trust obligations of the United States to Indians),

*United States v. Eberhardt,* 789 F.2d 1354, 1360 (9th Cir.1986) ("We hold that the general trust statutes in Title 25 do furnish Interior with broad authority to supervise and manage Indian affairs and property commensurate with the trust obligations of the United States."), satisfies the representation criteria and allows it to adequately represent the absent tribes "unless there exists a conflict of interest between the United States and the tribe." *Southwest Ctr. for Biological Diversity v. Babbitt,* 150 F.3d 1152, 1154 (9th Cir.1998). However, for a conflict of interest to preclude a tribe's representation by the Secretary, there must be a "clear potential for inconsistency between the Secretary's obligations to the Tribes and its [other] obligations" that arises "in the context of th[e pending] case." *Washington v. Daley,* 173 F.3d at 1168–69 (holding that United States could adequately represent tribes' interests because there was no direct conflict between tribes and the United States, or between the tribes themselves).

Amicus curiae CNIGA has not carried its burden of demonstrating an actual conflict of interest in the pending litigation that would prevent the United States from adequately representing California's Indian tribes.[45] "In fact, the Secretary and the Tribes have virtually identical interests in this regard." *Id.* at 1167–68. The Secretary and California's Tribes agree on the central issue at hand: Exclusive class III gaming compacts for Indian tribes are consistent with IGRA and the Equal Protection Clause. Indeed, even the Indian

tribes that have not yet signed class III gaming compacts agree with the Secretary's position in this regard.[46] Thus, CNIGA has "failed to demonstrate how ... a conflict might actually arise in the context of this case." *Id.* at 1168.

Likewise, CNIGA has not demonstrated that any of the remaining alleged conflicts are likely to arise in the context of this case. Most relate to the United States' exclusive jurisdiction to enforce gaming laws under 18 U.S.C. § 1166. CNIGA, however, fails to explain how pending or past enforcement actions would prevent the Secretary from adequately representing the tribes in a case that does not even remotely bear on the United States' enforcement power. *See Southwest Center for Biological Diversity,* 150 F.3d at 1154 (reversing district court's decision that United States could not represent tribes due to potential conflict noting that court identified "no argument the United States would not or could not make on the Community's behalf"). Moreover, CNIGA's position supports the improbable conclusion that § 1166 prevents the United States from ever representing tribes in IGRA cases. *See Washington v. Daley,* 173 F.3d at 1168 (United States could represent Indian tribes notwithstanding its enforcement role under the Fishery Conservation and Management Act, 16 U.S.C. §§ 1858–1860).

CNIGA's final argument is equally unpersuasive. It contends that the United States agreed that the BIA would cease its

---

**45.** Although a novel argument, the Model Rules of Professional Conduct are not relevant to determining whether an existing party's interests conflict with an absent party's interests. *See* CNIGA Amicus Brief at 12–13. No court has adopted this approach to determining the adequacy of representation under Fed.R.Civ.P. 19.

**46.** Similarly, the Secretary can represent the tribes who are parties to *In re Indian Gaming*

*Related Cases,* 147 F.Supp.2d 1011 (N.D.Cal. 2001), because they do not challenge the ability of tribes to exercise exclusive class III gaming rights. Further, the plaintiffs also lack standing to challenge the assessment provisions that are at issue in that case. *See infra* pp. 1131–32. Thus, any potential for conflict between the tribes and the Secretary on this score will not ripen into an actual conflict.

acquisition of the San Pablo ·land in trust for the Lytton Band without an injunction and thereby gained more time to brief this case by trading the Lytton Band's statutory rights to have the BIA proceed unless enjoined. However, CNIGA overlooks that this "strategy" was adopted to better represent the position of the tribes, including the Lytton Band. In any event, future compacts are not part of this case given the court's ruling on standing.

For these reasons, the court finds that CNIGA failed to carry its burden of demonstrating that California's Indian tribes are necessary and indispensable parties.[47]

## VI. IGRA [48]

This case presents a novel issue of statutory interpretation. Section 2710(d)(1)(B) allows for class III tribal gaming only if "located in a State that permits such gaming for any purpose by any person, organization, or entity." The issue here is whether, for purposes of IGRA, a state constitutional amendment may "permit" Indian tribes to engage in otherwise prohibited forms of class III gaming, notwithstanding exclusive federal jurisdiction over Indian gaming; and, if so, whether a resulting class III gaming monopoly by tribes with compacts comports with IGRA's "any person, organization, or entity" requirement? Employing the traditional tools of statutory construction—the statute's plain language governs unless it is ambiguous, legislative history should only be consulted if the plain language is ambiguous or renders a tortured reading of the statute, and statutes benefitting Indian tribes are construed liberally in their

favor—and in deference to the Secretary's interpretation, the court finds that under Proposition 1A, California lawfully permitted tribes with compacts to offer class III gaming, and that the compacts do not violate IGRA's "any person, organization, or entity" provision. *Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 64 F.3d 1250, 1257 (9th Cir.1994) (applying traditional canons of statutory interpretation to IGRA).

## A. Does California "Permit" Class III Gaming?

 Proposition 1A authorizes the Governor to enter into class III gaming compacts with Indian tribes "in accordance with federal law." Plaintiffs argue that California may not rely on Proposition 1A to "permit" tribes to offer class III gaming because states only acquire jurisdiction over gambling on Indian lands after executing a valid compact under IGRA. (Pls.' Motion at 23–24; Pls.' Reply at 9). According to plaintiffs, this logical conundrum deprives Proposition 1A of "permission" status under § 2710(d)(1)(B) of IGRA. Although not without force, for several reasons, the court is not persuaded by this argument.

To begin with, Proposition 1A unambiguously authorizes the Governor and the State Legislature to conclude class III gaming compacts with Indian tribes subject to the terms of federal law, notwithstanding contrary provisions of state law which generally prohibit such gaming. Proposition 1A explicitly excepts Indian gaming from provisions of state law that

---

**47.** Because the court finds that the tribes are not necessary parties, it does not consider whether they are indispensable parties under Fed.R.Civ.P. 19(b). *See Washington v. Daley,* 173 F.3d at 1169 ("indispensable" analysis unnecessary after determining that absent party is not necessary).

**48.** It is unnecessary to address the state defendants' argument that the plaintiffs lack a private right of action to enforce IGRA because their claims are brought under § 1983 and the APA. *See, e.g., Hein v. Capitan Grande Band of Diegueno Mission Indians,* 201 F.3d 1256, 1260–61 (9th Cir.2000); *State of Florida v. Seminole Tribe,* 181 F.3d 1237, 1245–50 (11th Cir.1999).

otherwise prohibits slot machines, lottery games, and banking card games. And it authorizes compacts and gaming under these compacts against the backdrop of, or by incorporating, federal law, specifically, IGRA. In this sense, Proposition 1A permits tribal gaming under IGRA. Of course, outside of the context of IGRA, California cannot unilaterally legalize tribal gaming. The issue here, however, is whether it may, for purposes of § 2710(d)(1), "permit" such gaming within the general context of IGRA. This is a question of statutory construction.

A state's affirmative permission to tribes to engage in gaming within the structure of IGRA may not have been on the forefront of what Congress had in mind in enacting IGRA and § 2710(d)(1)(B). But it is a kind of permission that is not foreclosed by the language of IGRA, and fits well within its plain language. In enacting IGRA, Congress employed capacious language to clarify the situations in which it would be lawful for Indian tribes to offer class III gaming. Section 2710(d)(1)(B) reflects this approach. It states that class III gaming activities are lawful on Indian lands only if the activities are "located in a State that permits such gaming for any purpose by any person, organization, or entity." 25 U.S.C. § 2710(d)(1)(B). As discussed in the next section, the "any purpose" "any person" language suggests that this prerequisite is easily met. *See infra* pp. 1122–23. The Act does not define "permits"; neither placing restrictions on the word nor otherwise limiting its meaning. Section 2710(d)(1)(B) does not say "permits such gaming *independently of IGRA* for any purpose by any person, organization, or entity." It does not say

"permits such gaming for any purpose by any person, organization, or entity *other than Indian* tribes." And it is precisely because Congress did not write the Act in either of these ways that California, subject to the Secretary's approval, may "permit" class III gaming within the structure of IGRA, even though the permission is not entirely independent of IGRA, and even though IGRA prevents states from unilaterally legalizing tribal gaming. In short, the statute is written broadly, and it is consistent with the co-operative federalism at the heart of IGRA to allow the state to "permit" tribal gaming under the Act by exempting the tribes from state prohibitions on banked gaming and slot machines.[49]

Plaintiffs argue that this construction negates the state permission requirement of § 2710(d)(1)(B) because a state that satisfies the compact requirement, § 2710(d)(1)(C), would also be one that "permits such gaming." *See Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana,* 472 U.S. 237, 249, 105 S.Ct. 2587, 86 L.Ed.2d 168 (1985) (noting " 'the elementary canon of construction that a statute should be interpreted so as not to render one part inoperative' ") (quoting *Colautti v. Franklin,* 439 U.S. 379, 392, 99 S.Ct. 675, 58 L.Ed.2d 596 (1979)). Two courts have held that a compact entered into under § 2710(d)(1)(C), does not satisfy the state permission requirement of § 2710(d)(1)(B). *Citizen Band Potawatomi Indian Tribe v. Green,* 995 F.2d 179, 181 (10th Cir.1993); *American Greyhound Racing,* 146 F.Supp.2d 1012, 1067–69 (D.Ariz.2001).

However, unlike in *Green* and *American Greyhound Racing,* California does not

---

**49.** Furthermore, this interpretation of "permit" is consistent with the Ninth Circuit's construction of the term, as employed in IGRA, to mean " '[t]o suffer, allow, consent, let; to give leave or license; to acquiesce by failure to prevent, or to expressly assent or

agree to the doing of an act.' " *Rumsey,* 64 F.3d at 1257 (quoting from Black's Law Dictionary). Here, by constitutional amendment, California "permits" class III gaming through the compacting procedure as set forth in IGRA.

rely on the compacts themselves for the purpose of permitting class III gaming. Separate from the compacts, by constitutional amendment, California specifically exempted Indian tribes from the State's general gambling prohibitions, and granted them permission. Although the vehicle for California's exemption, Proposition 1A, integrates and depends on the successful conclusion of gaming compacts, Proposition 1A is still distinct from the compacts. For all of these reasons, and in deference to the Secretary's interpretation, *see infra* pp. 1126–27, the court finds that by Proposition 1A, California "permits" class III gaming as required by IGRA.

### B. *Any Person, Organization, or Entity*

Plaintiffs further contend that because California only permits Indian tribes to offer class III gaming activities, it is not a state that "permits such gaming for any purpose by any person, organization, or entity." (Pls.' Motion at 18). 25 U.S.C. § 2710(d)(1)(B). According to the plaintiffs' interpretation of § 2710(d)(1)(B), a state cannot satisfy the "any person, organization, or entity" requirement unless the state "permits such gaming for non-Indians." (Pls.' Motion at 22). Plaintiffs interpret "any" as "every," as opposed to "any one." This argument fails for several reasons.

To begin with, as already noted, the statute's plain language does not support the plaintiffs' reading of the "any person, organization, or entity" requirement. Congress did not say that a state had to permit class III gaming activities for any *non-Indian* purpose for any *non-Indian* person, organization, or entity. Instead, as with the word "permits," Congress structured the requirement to provide states and tribes with maximum flexibility to fashion a class III gaming compact.

The failure of the plaintiffs' argument is evident in Congress' use of "any" as a modifier for the class III gaming that a state must permit before a tribe may enter into a compact. The word "any" can mean "every" or "one." However, interpreting "any" in § 2710(d)(1)(B) to mean "every" must be rejected. If IGRA required that a tribe could only enter a compact if located in a state that permitted such activities for every purpose by every person, organization, or entity, no tribe would be allowed to enter into a class III gaming compact because all states impose at least some limits on who can offer gaming and for what purpose. Therefore, § 2710(d)(1)(B) is best understood as allowing class III gaming compacts in states that permit that kind of gaming for at least one purpose, by at least one person, organization, or entity. Because California permits class III gaming by tribes with compacts under Proposition 1A, the State also satisfies § 2710(d)(1)(B)'s "any purpose by any person, organization, or entity" requirement. *See American Greyhound Racing,* 146 F.Supp.2d at 1067 ("[t]he State must first legalize a game, even if only for tribes, before it can become a compact term").

Finally, plaintiffs contend that this issue is governed by the Ninth Circuit's ruling in *Rumsey Indian Rancheria of Wintun Indians v. Wilson,* 64 F.3d 1250 (9th Cir. 1994). In *Rumsey,* the court observed that "a state need only allow Indian Tribes to operate games that others can operate, but need not give tribes what others cannot have." *Id.* at 1258. *Rumsey* settled the question of whether a state must negotiate class III gaming compacts with Indian tribes when the state does not permit those activities for anyone.[50] The decision

---

**50.** *Rumsey* also held that "IGRA does not require a state to negotiate over one form of Class III gaming activity simply because it has legalized another, albeit similar form of gaming. Instead, the statute says only that, if a state allows a gaming activity 'for any pur-

does not address the issue presented here—whether the state may negotiate class III gaming compacts with Indian tribes even if the state does not permit those activities for non-Indians. Plaintiffs' argument that this "is a distinction without a difference," simply restates their position that a state may not affirmatively permit Indian tribes to engage in class III gaming without opening up such gaming to everyone else. Neither the "any person, organization, or entity" requirement nor *Rumsey* supports the plaintiffs' position.

In short, the court concurs with the Secretary that the exclusive class III gaming compacts, as permitted by Proposition 1A, are within the plain language of IGRA.

### C. *Legislative History*

IGRA's plain language might obviate the need to rely on legislative history. But to the extent that the language of § 2710(d)(1)(B) might be ambiguous, a review of the legislative history tends to support the Secretary's construction of IGRA. *See Wilshire Westwood Assoc. v. Atlantic Richfield Corp.*, 881 F.2d 801, 805 (9th Cir.1989) (noting that plain meaning of statute rendered legislative history unnecessary but that legislative history supported plain meaning construction). The legislative history is silent on the precise dispute here concerning the construction of § 2710(d)(1)(B). But it does suggest that Congress had three overriding purposes concerning the relationship between the tribes and the states: (1) provide the state with regulatory authority over class III gaming through the compact procedure; (2) permit the states and tribes a considerable degree of flexibility in negotiating the terms on which class III gaming would occur; and (3) ensure the tribes that

the states would not bar class III gaming on Indian land, while at the same time permitting others to engage in such gaming elsewhere in the state. The Secretary's interpretation of § 2710(d)(1)(B), which would allow to California the flexibility to permit class III gaming only on Indian lands, is consistent with these three purposes.

In the five years before IGRA was passed, at least six bills were introduced in Congress for the purpose of regulating Indian gaming and a similar number of hearings were held. By 1987, however, only two such bills were under serious consideration. S. 555, 100th Cong. (1987) and S. 1303, 100th Cong. (1987).[51] Both bills incorporated the "class" approach to regulating Indian gaming present in the final version of IGRA. The primary difference between the two bills was in how they regulated gaming. Under S. 555, a tribe seeking to engage in class III gaming would cede jurisdiction to the state in which its lands were located and the state would then assume primary regulatory responsibility. The bill provided that an Indian tribe could offer a class III gaming activity

> otherwise legal within the State where such lands are located ... where the Indian tribe requests the Secretary [of the Interior] to consent to the transfer of all civil and criminal jurisdiction ... pertaining to the licensing and regulation of gaming over the proposed gaming enterprise to the State within which such gaming enterprise is to be located and the Secretary so consents.

S. 555, 100th Cong. § 11(d)(2)(A).

In contrast, under S. 1303, the federal government would have assumed responsi-

---

pose by any person, organization, or entity,' then it also must allow Indian tribes to engage in that same activity." *Rumsey*, 64 F.3d at 1258.

**51.** S. 1303 was identical to H.R. 2507, 100th Cong. (1987). S. 555 was based on H.R.1920, 99th Cong. (1985).

bility for regulating class III gaming, "where such Indian gaming is located within a State that permits such gaming for any purpose by any person, organization or entity." S. 1303, 100th Cong. § 10(b). In order to offer class III gaming, S. 1303 required tribes to adopt a class III ordinance which had to be approved by the Chairman of the National Indian Gaming Commission. After approving a tribe's class III gaming ordinance, the Chairman would "adopt a comprehensive regulatory scheme for such gaming activity . . . after consultation with the affected Indian tribe or tribes and with the appropriate officials of the State." *Id.* § 12(e)(1). Further, S. 1303 specified that "[t]he regulations adopted pursuant to this subsection shall be identical to those provided for the same activity by the State within which such Indian gaming activity is to be conducted which is applicable to a State licensee subsequent to the issuance of such license." *Id.* § 12(e)(2).

Both S. 555 and S. 1303 met with considerable opposition. States which "[h]istorically . . . had the primary responsibility for establishing and enforcing public policies regarding liquor and gambling because these matters have such a particularly localized impact," did not want to

cede jurisdiction to regulate tribal gaming within their borders and therefore opposed S. 1303. *Gaming Activities on Indian Lands and Reservations: Hearing Before the Senate Select Comm. on Indian Affairs on S. 555 to Regulate Gaming on Indian Lands and S. 1303 to Establish Federal Standards and Regulations for the Conduct of Gaming Activities on Indian Reservations and Lands, For Other Purposes,* 100th Cong. 510 (1987) (letter of John Van de Kamp, Attorney General, State of California)(hereinafter *"Hearings on S. 555 and S. 1303 "*). States feared that the federal government might permit tribes to offer forms of gambling otherwise prohibited under state law and opposed by the state, opening the door "for the tribes on the reservation to become an island" where state law would not apply and could not reach. *Id.* at 80 (statement of Sen. John Melcher, Member, Senate Select Comm. on Indian Affairs). For their part, most Indian tribes opposed S. 555 because it gave the states such extensive regulatory authority.[52]

Faced with a deadlock over whether the states or the federal government would have jurisdiction to regulate class III gaming by Indian tribes, Congress inserted the

---

**52.** Most tribes actually opposed both bills and believed that any regulation of tribal gaming was "a gross infringement upon tribal sovereignty." *Hearings on S. 555 and S. 1303,* at 496 (letter of Edgar Bowen, Tribal Chief/Chairman, Confederated Tribes of Coos, Lower Umpqua, and Siuslaw Indians); *see also id.* at 497–99 (letter of Wendell Chino, President, Mescalero Apache Tribe); *id.* at 500–01 (letter of Joseph Ely, Tribal Chairman, Pyramid Lake Paiute Tribal Council); *id.* at 502 (letter of John Hair, Chief, United Keetoowah Band of Cherokee Indians in Oklahoma); *id.* at 508 (letter of Mark Perrault, Chairman, Keweenaw Bay Indian Community); S.Rep. No. 100–446, at 4 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3074 ("Tribes generally opposed any effort by the Congress to unilaterally confer jurisdiction over gaming

activities on Indian lands to States and voiced a preference for an outright ban of class III games to any direct grant of jurisdiction to States."). Tribes that expressed a preference were strongly opposed to state jurisdiction. *See Hearings on S. 555 and S. 1303,* at 104 (Statement of Hon. William Houle, Chairman, Fond du Lac Band of Lake Superior Chippewas and Chairman, National Indian Gaming Association) ("National Indian Gaming Association only supports legislation, however, that does not transfer any jurisdiction to State government over Indian people, their activities, or their lands."); *id.* at 107 (Statement of Herman Agoyo, Chairman, All Indian Pueblo Council) ("Although we support Federal legislation to regulate Indian controlled gaming, we do not and will not support State jurisdiction.").

compact provision into the final version of S. 555. *See* 134 Cong. Rec. H8146–01 (daily ed. September 26, 1988) (statement of Rep. Udall) (noting that Congress had been unable to reach earlier compromise due to "conflict between the right of tribal self-government and the desire for State jurisdiction over gaming activity on Indian lands"). The Senate Committee Report that accompanied passage of IGRA explains the role of the compacts in balancing the interests of the states and the tribes:

After lengthy hearings, negotiations, and discussions, the Committee concluded that the use of compacts between tribes and states is the best mechanism to assure that the interests of both sovereign entities are met with respect to the regulation of complex gaming enterprises.... The Committee notes the strong concerns of states that state laws and regulations relating to sophisticated forms of class III gaming be respected on Indian lands where, with few exceptions, such laws and regulations do not now apply. The Committee balanced these concerns against strong tribal opposition to any imposition of State jurisdiction over activities on Indian lands. The Committee concluded that the compact process is a viable mechanism for settling various matters between two equal sovereigns.

S.Rep. No. 100–446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083. Therefore, by giving the states a primary role in the regulatory oversight of tribal gaming, while at the same time permitting tribes to sue states that refused to enter into negotiations for class III gaming compacts, the compact provision sought to satisfy both the states' desire to regulate and the tribes' concern that state regulation under S. 555 might preclude all tribal gaming. *See* S.Rep. No. 100–446, at 14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3084 ("[T]he issue before the Committee was how best to encourage States to deal fairly with tribes as sovereign governments. The Committee elected, as the least offensive option, to grant tribes the right to sue a State if a compact is not negotiated and chose to apply the good faith standard as the legal barometer for the State's dealings with tribes.").

As to the language in § 2710(d)(1)(B) at issue here, the legislative history is silent. There is no explicit discussion of the "permit" or "any person" formulation in the committee hearings or reports. Perhaps the most direct inference may be drawn from Congress' decision to include the current formulation of § 2710(d)(1)(B) which comes from S. 1303, even though S. 555 was the basis for most of the final version of IGRA. The comparable provision in S. 555 permitted class III tribal gaming where "otherwise legal within the State where such lands are located." This formulation would seem to block a state from permitting tribal gaming while otherwise prohibiting gaming by others. But this language was not carried over into IGRA, perhaps suggesting that Congress did not intend to so limit the states or the tribes.[53]

It is fair to conclude from the legislative history that Congress was not concerned about the situation in which a state and the tribes together affirmatively sought to foster exclusive class III gaming on tribal lands. This was not the context in which

---

**53.** Plaintiffs attempt to put the best face on IGRA's adoption of the "permits such gaming for any purpose to any person" language from S. 1303 rather than the "otherwise legal" language of S. 555. Plaintiffs argue that because the state permission language originated in S. 1303, which provided for exclusive federal regulation of class III gaming and which lacked the State–Tribal compact procedure, it must have referred only to gambling that was permitted on non-Indian land. But the language was taken from S. 1303 and substituted into S. 505 which did not provide for exclusive federal regulation.

Congress acted; rather, Congress faced a situation in which the states were insisting on their right to control or prohibit and the tribes were insisting on their right to be free from state regulation. While IGRA's legislative history does not suggest that Congress specifically contemplated a State's support of a monopoly for tribal gaming, Proposition 1A and the compacts here are nevertheless consistent with the overarching concerns that led to the IGRA compromise: The State gains flexible regulatory authority while class III gaming by the tribes is protected from discrimination by the State.

Further, California's decision to "permit" tribes to operate class III gaming facilities within the context of IGRA and the compacts, while denying those rights to other persons, organizations, and entities, is a policy judgment, which whether one agrees with it or not, does not conflict with IGRA's goal of maintaining state authority while protecting Indian gaming from discrimination. By contrast, to interpret IGRA to require the states to chose between no class III gaming anywhere and class III gaming everywhere would not further any of IGRA's goals and would limit the states' authority and flexibility without any resulting benefit to the tribes.

Finally, passing references in the legislative history to achieving "a fair balancing of competitive economic interests" and to developing a uniform "regulatory and jurisdictional pattern" provide little support to plaintiffs' position. Congress' expressed concern about competition was to ensure that the tribes, not other parties, could compete with any group operating under a state gambling license. *See* S.Rep. No. 100–446, at 13 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083 ("It is the Committee's intent that the compact requirement for class III not be used as a justification by a State for excluding Indian tribes from such gaming or for the protection of other State-licensed gaming enterprises from free market competition with Indian tribes."). Further, the discussion of consistent regulation was simply part of Congress' goal of extending state regulatory authority to Indian lands so that these lands would not become islands free from state oversight.[54]

D. *Deference to the Secretary's Interpretation*

In interpreting IGRA the court has given substantial deference to the Secretary's understanding of IGRA as expressed in her approval of the compacts. This deference is appropriate under *Chevron U.S.A. v. Natural Res. Def. Council,* 467 U.S. 837, 842–45, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). First, there is no explicit direction from Congress as to whether a state may "permit" tribal gaming within the context of IGRA, or whether a resulting class III gaming monopoly violates IGRA. *Id.* at 843, 104 S.Ct. 2778. Congress was understandably not focused on the situation in which the states and tribes agreed to ex-

---

**54.** There are several flaws in plaintiffs' argument that § 2710(d)(1)(B) precludes California from granting tribes exclusive class III gaming rights because Congress intended that such gaming would only take place in states with a history of regulating similar activities. (Pls.' Motion at 30–33). When Congress drafted IGRA, it did not restrict class III gaming to states with such experience. Because it could lead to the untenable result in which states without this regulatory experience would be precluded from simultaneously granting gaming rights to Indians and non-Indians alike, such an interpretation of § 2710(d)(1)(B) is contrary to Congress' interest in preserving state sovereignty and providing tribes with an opportunity to develop gaming operations. Furthermore, Congress recognized that not every state compact would confer exclusive authority to regulate class III gaming on preexisting state regulatory bodies. *See* S.Rep. No. 100–446, at 13–14 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3083–84.

clusive class III Indian gaming rights. *Yang v. I.N.S.*, 79 F.3d 932, 935 (9th Cir. 1996) (applying traditional methods of statutory interpretation to determine if Congress spoke to an issue under *Chevron* step one). Therefore, because "Congress has left a gap for the administrative agency to fill, [the court] proceed[s] to step two" of *Chevron. Zimmerman v. Oregon Dep't of Justice*, 170 F.3d 1169, 1173 (9th Cir.1999).

Second, for the reasons already stated, the Secretary's interpretation of IGRA is reasonable. *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. The Secretary's interpretation is consistent with the statute's language and it complements IGRA's legislative history by balancing state and tribal sovereignty and interests. Moreover, although the Ninth Circuit gives priority to *Chevron* over the rule of interpretation that statutes enacted for the benefit of Indian tribes should "be construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit," the two doctrines here point to the same outcome. *Navajo Nation v. Dep't of Health and Human Serv.*, 285 F.3d 864, 870 (9th Cir. 2002) (quoting *Montana v. Blackfeet Tribe of Indians*, 471 U.S. 759, 766, 105 S.Ct. 2399, 85 L.Ed.2d 753 (1985)); *Williams v.*

*Babbitt*, 115 F.3d 657, 663 n. 5 (9th Cir. 1997).

Also, although the Secretary's interpretation came in the form of a letter, and subsequent publication of approval in the Federal Register, *Chevron* deference still applies because the Secretary's letter "was not an 'opinion letter,' but, rather, a final, albeit informal, adjudication on the merits." *Navajo Nation*, 285 F.3d at 871. Indeed, as in *Navajo Nation* where the Ninth Circuit held that a similar letter constituted an informal adjudication that warranted *Chevron* deference, "Congress delegated to the Secretary the authority to adjudicate in this manner." 25 U.S.C. § 2710(d)(8)(A), (D) (authorizing Secretary to approve compact and requiring publication of approval in Federal Register). Moreover, the Secretary's letter explained the basis for her approval and why she found that the compacts were consistent with IGRA and equal protection.[55] (*See* Letter from Kevin Gover, May 5, 2000, Exh. B to Complaint).

The Secretary is responsible for administering IGRA and reviewing class III gaming compacts, and her interpretation of the statute is entitled to a degree of deference.[56]

**55.** The Secretary's approval specifically notes that the compacts limit gaming to "the Tribes' reservation land;" that through Proposition 1A, "Californians amended their state's constitution to permit the Governor to compact with Indian tribes, subject to ratification by the State Legislature;" and that granting tribes exclusive class III gaming rights "in no way violates the equal protection provisions of the United States Constitution." (Letter from Kevin Gover, May 5, 2000, Exh. B to Complaint).

**56.** Citing *Williams v. Babbitt*, 115 F.3d 657 (9th Cir.1997), plaintiffs contend that the Secretary's interpretation of IGRA should be rejected because it raises a difficult constitutional question. (Pls.' Motion at 33–34; Pls.' Reply at 16–17). However, "the 'constitu-

tional doubt' canon does not apply mechanically whenever there arises a significant constitutional question the answer to which is not obvious." *Almendarez–Torres v. United States*, 523 U.S. 224, 239, 118 S.Ct. 1219, 140 L.Ed.2d 350 (1998). Rather, the rule applies "[o]nly if the agency's proffered interpretation raises *serious* constitutional concerns." *Williams*, 115 F.3d at 662 (emphasis in original). Although the Secretary's interpretation of IGRA raises a constitutional question, it is not sufficiently serious to require a different reading of the statute. Under *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974), preferences in favor of Indian tribes are classified as political, not racial, and therefore are reviewed deferentially. *See infra* pp. 1127–30.

### E. *Conclusion*

Although the issue is not free from doubt, because of the statutory presumption in favor of Indian tribes, the deference owed to the Secretary's interpretation, and the Act's language and legislative history, the court concludes that California's compacts with the Indian tribes do not violate IGRA.[57]

### VII. Equal Protection

 The final issue is whether California's compacts, and their approval by the Secretary, violate the Due Process and Equal Protection Clauses of the Fifth and Fourteenth Amendments.[58] Plaintiffs argue that the compacts and Proposition 1A should be evaluated under the strict scrutiny standard, rather than the modest, deferential standard of review from *Morton v. Mancari*, 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). (Pls.' Motion at 35–49). Further, plaintiffs argue that even if the *Mancari* standard applies, the compacts and Proposition 1A violate equal protection because they are not rationally related to the furtherance of Congress' trust obligation to Indian tribes and to uniquely Indian interests. (*Id.* at 49–54). For the following reasons, the court concludes that *Mancari* does apply, and that the compacts are rationally related to Congress' trust obligation.

In *Morton v. Mancari*, the Supreme Court upheld a statutory hiring preference for Indians in the Bureau of Indian Affairs ("BIA"). 417 U.S. 535, 94 S.Ct. 2474, 41 L.Ed.2d 290 (1974). The Court noted that Indian tribes have a unique status under federal law as quasi-sovereign entities and that laws enacted on their behalf reflect political rather than racial classifications. *Id.* at 553–54, 94 S.Ct. 2474. Consequently, the Court applied a deferential standard of review and upheld the BIA hiring preference noting that it was "reasonably and directly related to a legitimate, nonracially based goal," tribal self-government. *Id.* at 554, 94 S.Ct. 2474. The Court tied its equal protection analysis to the tribes' special status and the federal government's special trust obligation: "As long as the special treatment can be tied rationally to the fulfillment of Congress' unique obligation toward the Indians, such legislative judgments will not be disturbed." *Id.* at 555, 94 S.Ct. 2474.

In applying *Mancari*, the Ninth Circuit has recognized that the *Mancari* standard and Congress' trust obligations apply to interests much broader than tribal self-government including the "right of individ-

---

Moreover, the preference accorded to tribes differs from the preference found to raise a grave constitutional question in *Williams v. Babbitt*. The preference in *Williams* was given to Indians as individuals and applied on non-Indian lands. 115 F.3d at 664. Here the preference is given to tribes and applies only to the lands within the tribes' sovereignty. 25 U.S.C. § 2710(d)(1).

**57.** The same analysis applies to the plaintiffs' claims under the Johnson Act, 15 U.S.C. § 1175. California satisfies IGRA's waiver provision of the Johnson Act, 25 U.S.C. § 2710(d)(6), *see supra* p. 1093 n. 8, because California both makes gambling devices legal through Proposition 1A and the compacts, and it has Tribal–State compacts in effect.

**58.** For purposes of clarity, references to "equal protection" or the "Equal Protection Clause" encompass both plaintiffs' claim against the federal defendants under the Due Process Clause of the Fifth Amendment as well as plaintiffs' Fourteenth Amendment claim against the state defendants. *See Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 201, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (noting "congruence" principle: " 'Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment.' ") (quoting *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976)).

ual Indian profit-making businesses to be free from state taxation; [the] right to fish; [and] imposition of federal rather than state law on Indians committing crimes on reservations." *Alaska Chapter*, 694 F.2d at 1168 (internal citations omitted).[59]

California's compacts with the tribes are rationally related to the furtherance of Congress' unique obligation to the tribes. IGRA was enacted for the purposes of "promoting tribal economic development, self-sufficiency, and strong tribal governments" as well as shielding tribal gaming from organized crime. 25 U.S.C. § 2702(1), (2). The compacts expressly incorporate these purposes, (Compact at Preamble F ("The State has a legitimate interest in promoting the purposes of IGRA.")), and similarly state that class III gaming constitutes a way to "enable the Tribe to develop self-sufficiency, promote tribal economic development, and generate jobs and revenues to support the Tribe's government and governmental services and programs." (Compact at 1.0(b)). Further, the compacts note that "[t]he exclusive rights that Indian tribes in California, including the Tribe, will enjoy under this Compact create a unique opportunity for the Tribe to operate its Gaming Facility in an economic environment free of competition from ... Class III gaming ... on non-Indian lands in California." (*Id.* at Preamble E).

Therefore, the compacts, entered into under IGRA, are designed to encourage tribes to become politically and economically self-sufficient while preserving tribal sovereignty and mitigating organized crime, all of which fit within the broad mandate of the federal government's trust obligation. *See Alaska Chapter*, 694 F.2d at 1170 ("Encouraging and assisting Indian-owned businesses helps develop such leadership and furthers the government's trust obligation to help the Indians develop economic self-sufficiency."); *St. Paul Intertribal Housing Bd. v. Reynolds*, 564 F.Supp. 1408, 1413 (D.Minn.1983) (noting broad scope of federal trust obligation to Indian tribes). These objectives are "fundamental to the federal government's trust obligation with tribal Native Americans." *Peyote Way Church*, 922 F.2d at 1216.[60] Moreover, permitting tribes with compacts to exercise exclusive class III gaming rights on Indian land is rationally related to these objectives and, therefore, to the furtherance of Congress' trust obligations to the tribes. *See Bd. of Comm'rs of Creek County v. Seber*, 318 U.S. 705, 63 S.Ct. 920, 87 L.Ed. 1094 (1943) (upholding exclu-

**59.** In *Williams*, the Ninth Circuit also suggested that *Mancari* was limited to classifications "that affect uniquely Indian interests." *Williams*, 115 F.3d at 665. The court also offered the view in dicta that a monopoly on gambling accorded to Indians would not relate to unique Indian interests.

Even if *Williams'* interpretation were correct and *Mancari* is limited to "statutes that affect uniquely Indian interests," the compacts here would survive because by limiting such gaming to Indian land, they "give special treatment to Indians on Indian land." *Id.* at 665. If there is to be a more stringent "unique Indian interests" test for determining the standard of equal protection review, the development of such a test must await further guidance from the Ninth Circuit or the Supreme Court.

**60.** Congress' decision to curtail tribal jurisdiction over class III gaming by making such gaming contingent on state approval is consistent with the goal of furthering tribal sovereignty. (Pls.' Reply at 33). Following *Cabazon*, individual states retained authority to ban all tribal gaming along with all other gaming. IGRA created a structure within which the interests of tribes that wished to game were balanced with the interests of states in controlling crime. Given that all tribal gaming could have been banned, it was rational for Congress to further tribal sovereignty by balancing it against the interests of the states in regulating such gaming.

sive tax immunity for certain Indians). There is no dispute that by permitting tribes to exercise gaming rights on Indian land free from non-tribal competition, they are provided with a valuable economic benefit. Further, it was rational for Congress to allow the states to grant a tribal preference with respect to gaming, as opposed to some other economic or entertainment activity, because at least some tribes had already been engaged in gaming operations for the purpose of raising revenue prior to enactment of IGRA.[61] 25 U.S.C. § 2701(1); *American Greyhound Racing*, 146 F.Supp.2d at 1075. For these reasons, the Secretary's approval of the compacts was rationally related to the furtherance of Congress' trust obligations and does not violate equal protection. California's negotiation and approval of the compacts, under an explicit delegation of congressional authority, is similarly within Congress' trust obligations and is consistent with equal protection.[62] *See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. 463, 501, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979) (state action in preference of Indian tribes falls under *Mancari* when passed "under explicit authority granted by Congress").

Plaintiffs argue that strict scrutiny must apply because (1) *Mancari* was overruled in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); (2) *Mancari*'s deferential standard of review only applies to federal action while the compacts negotiated by California exceed the scope of Congress' delegation to the states; and (3) the compacts are racial classifications because they primarily benefit individual Indians. These contentions fail.

First, although there has been some comment in the case law about the impact of *Adarand* on *Mancari*, the Supreme Court did not overturn *Mancari*, and the majority opinion in *Adarand* never even mentions *Mancari* by name. *See id.* at 244, 115 S.Ct. 2097. No lower court has held that *Mancari* was overruled by *Adarand*. Therefore, until a higher court finds that *Mancari* has been overturned by the Supreme Court, it is controlling. *See Rice v. Cayetano*, 146 F.3d 1075, 1081 n. 17 (9th Cir.1998) (rev'd on other grounds *Rice v. Cayetano*, 528 U.S. 495, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000)); *American Greyhound Racing*, 146 F.Supp.2d at 1077 ("In these circumstances, the court must follow *Mancari* as the directly controlling case, for the Supreme Court reserves to itself the prerogative to find its opinions implicitly overruled by changing doctrine."). Moreover, while the regulation addressed in *Adarand* extended preferences to "Native Ameri-

---

**61.** It is of no consequence to the equal protection analysis that tribal gaming involves substantial amounts of gaming by non-Indians. (Pls.' Reply at 34). Were *Mancari* subject to such a limitation, many tribal preferences would fail because most commerce on Indian land is inextricably tied to non-Indian persons and companies. *See Alaska Chapter*, 694 F.2d at 1170 (noting congressional findings that most income generated on Indian land flows off-reservation).

**62.** For this reason, plaintiffs' reliance on *Malabed v. North Slope Borough*, 42 F.Supp.2d 927 (D.Alaska 1999) is misplaced. The tribal preference at issue in that case was not passed in response to an explicit delegation of congressional authority. *Id.* at 939 ("[North Slope Borough] has no constitutional mandate to promote Indians' interest."). Further, the preference, which favored native Alaskans, was enacted by a municipal body that was "overwhelmingly composed of Inupiat Eskimos," and therefore raised the specter of "a majority arrogat[ing] to itself special privileges and rights otherwise denied to similarly-situated members of the minority." *Id.* at 940. By contrast, having been approved by California's voters, Governor, Legislature, and the federal government, if the compacts lack for anything, it is surely not approval from the public and its elected officials.

cans," *Adarand,* 515 U.S. at 205, 115 S.Ct. 2097, both IGRA and the compacts address themselves to Indian tribes as sovereign entities. 25 U.S.C. § 2710(d)(1)(C) (noting that class III gaming requires a compact entered into by an Indian tribe); Compact at 1 (noting that compact is entered into between the State of California and a "federally-recognized sovereign Indian tribe"). For these reasons, IGRA and the compacts here do not implicate *Adarand*'s requirement of strict scrutiny for all racial classifications.

Plaintiffs' second argument is that strict scrutiny applies because California's compacts violate IGRA and states may only avail themselves of the *Mancari* standard when they act "under explicit authority granted by Congress." [63] *Washington v. Confederated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 501, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979). Because the compacts provide for assessments in excess of "such amounts as are necessary to defray the costs of regulating such activity," 25 U.S.C. § 2710(d)(3)(C)(iii), plaintiffs argue that California exceeded the authority delegated to the states in IGRA and, therefore, the exclusive class III gaming rights for tribes must survive strict scrutiny. (Pls.' Motion at 38–41). In essence, the plaintiffs seek to litigate the validity of the assessment provisions of the compacts within the confines of their argument about the level of scrutiny the court should apply to the question of equal protection.

This strained argument fails among other reasons because plaintiffs lack standing to challenge the compacts' assessment requirements, even within the context of their assault on equal protection. "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Warth v. Seldin,* 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). It is the tribes which have or are seeking compacts, rather than their competitors, who are the proper parties to challenge the assessment provisions because they are the ones who are directly injured by any such violation of IGRA.[64] Nor is there any obstacle that prevents Indian tribes from litigating such claims. *See Powers v. Ohio,* 499 U.S. 400, 411, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (noting that one requirement for exercise of third party standing is that "there must exist some hindrance to the third party's ability to protect his or her own interests"). The limitation on third party standing—the Supreme Court has referred to it as a "matter[ ] of judicial self-governance"—is no less relevant when encapsulated within an argument about the standard of review

---

**63.** Plaintiffs also contend that strict scrutiny applies because Congress was neutral with respect to whether the states would allow tribes to offer class III gaming, and, therefore, Congress did not affirmatively direct the states to adopt a specific policy in favor of class III gaming by the tribes. (Pls.' Reply at 25–26). But Congress intended at least to facilitate tribal gaming while balancing the sovereign interests of states and tribes. Moreover, it is not the case that Congress must mandate a particular type of state action, as opposed to merely allowing it, before a state may implement a tribal classification that will be evaluated under *Mancari.* The classification upheld in *Washington v. Confed-*

*erated Bands and Tribes of the Yakima Indian Nation,* 439 U.S. 463, 473–74, 99 S.Ct. 740, 58 L.Ed.2d 740 (1979), permitted, but did not require, certain states to assume civil and criminal jurisdiction over Indian land.

**64.** Even if the court were to address the merits of the plaintiffs' arguments about the assessment provisions, there is no reason to believe that a different outcome would be forthcoming than the one reached in *In re Indian Gaming Related Cases,* 147 F.Supp.2d 1011 (N.D.Cal.2001), where the district court held that the compacts' assessment provisions did not violate IGRA.

under the Equal Protection Clause. *Warth*, 422 U.S. at 500, 95 S.Ct. 2197. To the contrary, it is especially apt in this case where the focus of the litigation is on decidedly different issues and would require the court to consider a side dispute on the meaning of an entirely separate provision of IGRA. In short, the court finds that the provision of the compacts at issue here, the permission to engage in class III gaming, was based on authority delegated by the federal government. *See Confederated Bands and Tribes of the Yakima Indian Nation*, 439 U.S. at 501, 99 S.Ct. 740 (holding that *Mancari* applied to state regulation of Indian tribes enacted in response to specific delegation of authority by Congress to the state).[65]

Finally, the equal protection analysis does not change merely because it may be that some, or even most, of the monetary benefits of class III gaming inure to individual Indians rather than the tribes. (Pls.' Reply at 22). As *Mancari* illustrates, a tribal preference is not transformed from a political to a racial classification that requires strict scrutiny merely because the vehicle for the preference consists of individual members of tribes. The BIA hiring preference upheld in *Mancari* explicitly targeted individual Indians but was still considered a political classification that merited deferential review. *Mancari*, 417 U.S. at 554, 94 S.Ct. 2474. Moreover, it cannot fairly be said that a preference

which aids individual members of Indian tribes is not rationally related to Congress' trust obligation to the tribes. Individual members are benefitted not because they are Indian per se but because they are members of tribes that have entered into compacts and distributed the resulting income to their members. A contrary holding would both distort *Mancari* and hamstring the political branches in the exercise of their trust obligation to the Indian tribes.[66]

## VIII. Conclusion

This case has presented complex and novel issues relating to federal jurisdiction, IGRA, and equal protection. The issues have been ably briefed and argued by the parties and various amici. The legal issues presented reflect the significance of the difficult public policy choices made by the Secretary, the Governor, and the State of California relating to gambling. Those choices may be wise or unwise. The grant of an economic monopoly to any group presents serious questions that should cause careful consideration and hesitation. In a strong democratic system, in which the proponents and opponents of Indian gaming, and gambling more generally, can be heard, these important questions can continue to be evaluated and debated in the light of experience and future developments. These matters of social policy are not ones for the court to resolve but are

---

**65.** For this reason also, there is no equal protection violation under count IV which seeks to enjoin enforcement of California's Penal Code prohibitions against class III gaming by the plaintiffs. Following authority specifically delegated to it by Congress, California exempted Indian tribes from otherwise generally applicable laws prohibiting class III gaming. This benefit to Indian tribes is evaluated under *Mancari* and is consistent with the Equal Protection Clause.

**66.** Plaintiffs also contend that the compacts constitute racial preferences because tribal

membership depends, at least in part, on race. (Pls.' Reply at 22 n.14). Even if true, strict scrutiny does not apply under the case law. *Mancari* illustrates this point, as the BIA hiring preference only applied to persons who were "one-fourth or more degree Indian blood and . . . a member of a Federally-recognized tribe." *Mancari*, 417 U.S. at 554 n. 24, 94 S.Ct. 2474; *see also Alaska Chapter*, 694 F.2d at 1168 ("If the preference in fact furthers Congress' special obligation, then *a fortiori* it is a political rather than racial classification, even though racial criteria might be used in defining who is an eligible Indian.").

properly left for resolution by the political branches and the electorate. Where the political branches and the people of California have adopted a policy that does not violate either federal law or the United States Constitution, that policy is entitled to prevail.

For the foregoing reasons, the plaintiffs' motion with respect to IGRA, the Equal Protection Clause, and the Due Process Clause is DENIED and the motions of the state and federal defendants are GRANTED. As to standing, the state defendants' motion is GRANTED as to (1) the Governor and future compacts under count II; (2) the Commission and the Director under count II; (3) the Governor under count III; and (4) the Commission under count IV, but is DENIED as to (1) the Governor as to the existing compacts and count II; and (2) the Attorney General and the Director under count IV. As to *Ex parte Young* and § 1983, the state defendants' motion is GRANTED as to (1) the Commission and the Director under count II; and (2) the Commission under count IV, but is DENIED as to (1) the Governor under count II; and (2) the Attorney General and the Director under count IV. With respect to the APA, the federal defendants' motion is DENIED. The motion to dismiss for failure to join necessary and indispensable parties is DENIED.

Judgment shall enter for defendants.

IT IS SO ORDERED.